**Wanda June WEEKS, Plaintiff,**

v.

**UNITED STATES of America et al., Defendants.**

**Dorothy FRAZIER and Ruth Rattler, on their own behalf and on behalf of all those similarly situated, Plaintiffs,**

v.

**Stanley K. HATHAWAY, Individually and in his capacity as Secretary of the Interior of the United States of America, Defendant,**

**The Delaware Tribe of Indians et al., Intervenors.**

**Nos. CIV–73–586–E and CIV–74–368–D.**

United States District Court,
W. D. Oklahoma.

Dec. 18, 1975.

Delmer L. Stagner and Stephen P. Friot, Oklahoma City, Okl. (Halley, Spradling, Stagner & Alpern, Oklahoma City, Okl., and Henry B. "Boots" Taliaferro, Jr., Casey, Lane & Mittendorf, Washington, D. C., of counsel, on the briefs), for plaintiff Weeks.

John G. Ghostbear, Tulsa, Okl., for plaintiffs Frazier and Rattler.

Duard R. Barnes, Asst. Sol. of Indian Affairs, U. S. Dept. of Interior, Washington, D. C., and Givens L. Adams, Asst. U. S. Atty., Oklahoma City, Okl. (William R. Burkett, U. S. Atty., Oklahoma City, Okl., on the briefs), for defendant Secretary of the Interior.

Bruce Miller Townsend, Tulsa, Okl., and Clyde J. Watts, Oklahoma City, Okl. (Watts, Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., on the briefs), for defendant and intervenors, The Delaware Tribal Business Committee, and others.

Granville Tomerlin and B. J. Rothbaum, Jr., Oklahoma City, Okl. (Tomerlin, High & Patton, Oklahoma City, Okl., on the brief), for defendant The Absentee Delaware Tribe of Oklahoma Business Committee.

Before HOLLOWAY, Circuit Judge, DAUGHERTY, Chief District Judge, and EUBANKS, District Judge.

## MEMORANDUM OPINION

HOLLOWAY, Circuit Judge.

These suits challenge the constitutionality of two federal statutes. The first, Pub.L. 90–508, 82 Stat. 861, 25 U.S.C.A. §§ 1181–1186, determines the Indian descendants who may participate in the distribution of an Indian Claims Commission award redressing a wrong by the United States under an 1818 treaty with

the Delaware Tribe. 7 Stat. 188.[1] The second statute, Pub.L. 92–456, 86 Stat. 762, 25 U.S.C.A. §§ 1291–1297, performs the same function for a separate Indian Claims Commission award redressing a breach by the United States of an 1854 treaty with the Delawares. 10 Stat. 1048.[2]

Three classes of Delaware Indian descendants are represented by the parties in these cases. The plaintiffs represent a group known as the Kansas Delawares. The defendants represent two groups of descendants known as the Cherokee Delawares and the Absentee Delawares.

In 25 U.S.C.A. §§ 1181–86, relating to the 1818 wrong, Congress devised distributive classifications that permitted descendants in all three classes to share in the award. Invoking the Fifth Amendment Due Process Clause and equal protection principles incorporated by it, and the Just Compensation Clause, the Kansas Delawares challenge the constitutionality of the statute's inclusion of the Cherokee Delawares in these distribution provisions.

In 25 U.S.C.A. §§ 1181–86, relating to the 1854 wrong, Congress provided distributive classifications that permitted only the Cherokee Delawares and the Absentee Delawares to share in the award. With respect to this statute, the Kansas Delawares challenge the constitutionality of (1) their exclusion from the distributive provisions, specifically under the Due Process Clause and equal protection principles incorporated by it, and under the Just Compensation Clause, and (2) the inclusion of the Cherokee

Delawares and Absentee Delawares, invoking the same Fifth Amendment principles.

Plaintiffs seek declaratory, injunctive and mandamus relief against distributions under both statutes.

We find merit in plaintiffs' challenge to 25 U.S.C.A. §§ 1291–97 as an irrational classification, insofar as the statute excludes the plaintiff class of Kansas Delawares[3] from participating in the distribution of the award in Indian Claims Commission Dockets Nos. 72 and 298, relating to the 1854 wrong, and enjoin the defendant Secretary of Interior from making distribution of funds thereunder. We reject all other contentions of the Kansas Delawares concerning the validity of that statute.

We do not sustain the plaintiff Kansas Delawares' challenge to 25 U.S.C.A. §§ 1181–86, relating to the 1818 wrong, and vacate the preliminary injunction restraining distribution of the remaining funds of the award in Indian Claims Commission Docket No. 337 redressing that wrong.

The plaintiff Weeks in No. Civ. 73–586–E filed her complaint alleging that this court has jurisdiction of this action "under Article III, Section 2 of the Constitution of the United States, under 28 U.S.C. § 1331 and § 1362, and 5 U.S.C. § 701 et seq." (Complaint para. 14). This three-judge court was convened to hear the case. After an evidentiary hearing we entered a preliminary injunction enjoining the defendant Secretary from distributing any of the funds held by him that were appropriated by Con-

---

1. The Indian Claims Commission findings and conclusions in Docket No. 337 concerning the wrong under this 1818 Treaty are reported at 9 Ind.Cl.Comm. 346.

2. The Indian Claims Commission findings and conclusions in Dockets Nos. 72 and 298 concerning the wrong under this 1854 Treaty are reported at 21 Ind.Cl.Comm. 344.

3. The Kansas Delaware class is reported to be composed of over 600 members (plaintiff Weeks' report on membership filed February 4, 1975). As of February, 1975, it was reported that notification by mail of 496 Kansas Del-

awares had been achieved (plaintiff Weeks' affidavit of service of notice of class action filed February 26, 1975).

The report to the court on membership of the Kansas Delaware class filed February 4, 1975, states that presently ascertained members whose identities are known total 636. In addition, the February 26, 1975, affidavit of plaintiff Weeks states that, upon receiving additional information from the Secretary as to identities and addresses of additional Kansas Delawares, approximately 42 additional persons were mailed notice, making a total of 678 Kansas Delawares who have been identified.

gress to satisfy the judgments in Indian Claims Commission Docket No. 337, dealing with the 1818 wrong, and Dockets Nos. 72 and 298, dealing with the 1854 wrong (with specified limited exceptions agreed to by all parties), pending the final determination of this action.

Plaintiffs Frazier and Rattler in No. Civ. 74–368–D filed their complaint in the Northern District of Oklahoma. Because this case involves substantially the same parties and subject matter, it was transferred to this district and consolidated with No. Civ. 73–586–E pursuant to Rule 42(a) F.R.Civ.P. The same panel was constituted to hear it.

This court sustained a motion to dismiss of the United States on the ground that the action as against the Government was an unconsented suit. Other motions to dismiss and for summary judgment were denied and we certified the action as against the remaining defendants to proceed as a class action by plaintiff class, the Kansas Delawares, against, inter alia, defendant classes, the Delaware Tribe of Indians (the Cherokee Delawares) and the Absentee Delaware Tribe of Western Oklahoma (the Absentee Delawares).[4] No question is raised as to the propriety of the class action procedure.

We will discuss the issues under the following propositions: (1) the historical background; (2) jurisdiction and justiciability; (3) validity of the statutory exclusion of the Kansas Delawares from distribution of the award redressing the 1854 wrong; (4) validity of inclusions of the Cherokee Delawares in distribution redressing both the 1818 and 1854 wrongs, and of the inclusion of the Ab-

sentee Delawares in distribution redressing the 1854 wrong;[5] and (5) equitable jurisdiction and remedies. This opinion will constitute our findings and conclusions pursuant to Rule 52, F.R.Civ.P.[6]

I

THE HISTORICAL BACKGROUND

The Delaware Indians were originally on the eastern seaboard, but by the second decade of the 19th century they were geographically scattered. One group of Indians of Delaware ancestry, the Munsee Indians, had become associated with the Moravian Indians, later known as the Christian Indians, or Christian Munsees, and had settled in Canada. Other Munsees were living with the Stockbridge in New York. This group became known as the Stockbridge Munsee. By 1818, the nucleus of the Delaware Nation was residing principally in Indiana and Ohio. See Senate Report accompanying H.R. 16402, S.Rep.No.1518, 90th Cong., 2d Sess. 8, which contains an historical outline of the Delaware Tribe and the various groups involved here (Defendants Secretary and Cherokee Delawares' Ex. 4, hereinafter cited as Senate Report).

Several years earlier, in 1793, the Spanish Government had granted a tract of land in Missouri to certain bands of the Delawares in Indiana and Ohio who wished to move beyond the Mississippi. A number of the Delawares moved to this grant, and later, on to Arkansas, Oklahoma and Texas, but the main body of the Tribe remained behind until the Treaty of St. Mary's was made in 1818, 7 Stat. 188 (Findings of fact Nos. 4 and 47,

---

4. Class action representation in this suit is proper under Rule 23(b)(1)(B) and Rule 23(b)(2), F.R.Civ.P., since adjudication with respect to the individual members of the classes would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests, and since the defendant Secretary and the several classes have acted on grounds generally applicable to said classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes as a whole.

5. As noted, the plaintiff Kansas Delawares do not challenge the inclusion of the Absentee Delawares in distribution of the award redressing the 1818 wrong.

6. There were numerous objections to the many exhibits offered in evidence at trial. We are citing those exhibits relied on in reaching our findings and conclusions and deny objections to the cited proof. Otherwise it is unnecessary to express evidentiary rulings.

Ind.Cl.Comm. Docket No. 337, *supra* n. 1, Pl. Ex. 10, Tabs A and P).

Under this 1818 Treaty, the Delawares ceded to the United States all their lands in Indiana,[7] and in return the United States agreed to give them land west of the Mississippi (Arts. 1, 2). It appears that no Christian Munsees and only some of the Stockbridge Munsees were in residence with the main body of the Delaware Tribe at the time the Indiana lands were ceded by the 1818 Treaty (Senate Report, *supra*, at 8–9).

The Delawares moved to the Missouri tract where they remained until 1829. In September of that year, the Delawares entered into another treaty with the United States, which was designated as a "supplemental article" to the 1818 Treaty. 7 Stat. 327. Under the terms of this supplemental treaty the Delawares gave up their temporary residence in Missouri and accepted in lieu thereof, as their permanent residence, a reservation in Kansas. This reserve was part payment for the Delaware cession of the Indiana lands, and purported to satisfy the obligation of the United States under the 1818 Treaty to provide the Delaware Nation a permanent home west of the Mississippi (Findings of fact Nos. 5 and 6, Docket No. 337). But the trade was grossly unequal. The disparity in value between the Indiana lands ceded by the 1818 Treaty and the Kansas lands received under the 1829 Treaty later became the basis for the judgment rendered by the Indian Claims Commission in Docket No. 337. The statute distributing this award, 25 U.S.C.A. §§ 1181–86, is one of the two distribution statutes being challenged in this suit.

After the Treaty of 1829 many of the Delawares that had preceded the Tribe into Missouri, and then into Arkansas, Oklahoma and Texas, moved on to the land assigned to them in Kansas. A portion of the members of the Delaware Tribe, however, remained in sections of Oklahoma and Texas. One group of Delawares, on its way from Texas to Kansas in 1853, obtained permission from the Choctaw Nation in the Anadarko area of Oklahoma to stay on its land as tenants at will (Finding of fact No. 48, Docket No. 337). Some of this group subsequently moved to the Kansas Reservation, but the majority remained behind in Oklahoma. These Delawares, together with others from Kansas and elsewhere that later joined them, maintained group identity, having chiefs and a tribal council up to the present time. The descendants of this group, who are now residing among the Wichita and Caddo Indians at Anadarko, Oklahoma, comprise the defendant class, the Absentee Delaware Tribe of Western Oklahoma, or Absentee Delawares (Finding of fact No. 51, Docket No. 337).

On May 6, 1854, the main body of the Delaware Tribe residing on the Kansas lands entered into a treaty with the United States, 10 Stat. 1048. Under this treaty, which was not signed by any representatives of the Absentee Tribe (Defendants' Adm. No. 37, Pl. Ex. 154), the Delawares ceded their lands in Kansas, with certain exceptions, to the United States. These lands comprised the so-called hunting "outlet," extending westward into mid-Kansas, and the "residence lands" (Finding of fact No. 2, Ind. Cl.Comm. Dockets Nos. 72 and 298, *supra* n. 2, Pl. Ex. 10, Tab Q). Of the residence lands, part was reserved to the tribe as a permanent home (Art. 1), and four sections were to be conveyed to the Christian Indians who had since migrated to Kansas and were living with the Delawares in 1854 (Art. 13; Senate Report, *supra*, at 10). The remaining portion of the residence lands, the Delaware "trust lands", was ceded to the United States to be sold at public auction, with the proceeds going to the Delaware general tribal fund (Arts. 2, 7; Finding of fact No. 2, Dockets Nos. 72 and 298).

However, in 1856 and 1857 the Government improperly sold the Delaware trust lands. It did not sell the lands at public auction as required by

---

7. The remaining Delaware lands in Ohio were ceded to the United States by separate treaties. No claim concerning those lands is involved here.

Article 2 of the 1854 Treaty, and as a result the Delawares received far less than they should have realized from the sale of their lands. (Findings of fact Nos. 4 and 8, Dockets Nos. 72 and 298). At this time ancestors of the plaintiff Kansas Delawares and of the defendant Cherokee Delawares were residing on Delaware lands in Kansas. The wrongful disposition of the Delaware trust lands in Kansas became the basis for the judgment rendered by the Indian Claims Commission in Dockets Nos. 72 and 298, and underlies the other distribution statute challenged herein, 25 U.S.C.A. §§ 1291–97.

Pursuant to the Treaty of 1854, the Delawares removed to that portion of the residence lands which the treaty had reserved for them as a permanent home (the "diminished reserve"). Then, by a treaty in 1860, 12 Stat. 1129, the United States agreed to survey the diminished reserve and to allot to each Delaware Indian an 80-acre tract in that reserve (Art. I). In addition, the treaty provided that 80-acre tracts were to be set aside for each of certain Absentee Delawares, approximated to be 200 in number, who were expected to move to Kansas and reassemble with the main body of the tribe in the near future (Art. IV).

In 1866 the Delawares entered into another treaty with the United States, 14 Stat. 793, the purpose of which was to provide for their removal to Indian Country in Oklahoma. The diminished reserve was to be sold by the United States, with the proceeds to be used for the purchase of 160 acres of land in the Indian Country for each Delaware man, woman and child who should remove thereto (Art. IV). However, all adult Delawares were to be given the opportunity under the treaty to elect whether to remove or, instead, to dissolve their relations with the Delaware Tribe and become citizens of the United States (Art. III). Each adult Delaware who thus elected to become a United States citizen was to receive fee simple title to the 80-acre tract allotted him under the 1860 Treaty, his just proportion of the Tribe's credits then held in trust (which included the proceeds of the sale of the trust lands), and also his proportion of the proceeds of the sale of the diminished reserve. Thereafter these persons were to share no further in Delaware property or annuities (Art. IX).[8]

The 1866 Treaty also provided that a registry would be made of the names of all the Delawares who thus elected to dissolve their tribal relations and remain in Kansas (Art IX). The names of 21 adults and 49 minors appear on such registry (Pl. Ex. 44). They are the ancestors of the plaintiff class Kansas Delawares.[9]

In July, 1866, the United States and the Cherokee Nation made a treaty which provided for the relocation of civilized Indians on unoccupied Cherokee lands in the Indian Country in Oklahoma. Art. XV, 14 Stat. 799. By an agreement in 1867 between the Delawares and the Cherokees (Pl. Ex. 10, Tab I), each individual of the Delaware Tribe who enrolled upon a certain register[10] acquired a life estate of 160 acres of land from the Cherokees (see *Delaware Indians v. Cherokee Nation*, 193 U.S.

---

**8.** Article IX of the 1866 Treaty is reproduced in Part C of the Appendix to this opinion.

**9.** Wanda June Weeks, the plaintiff in No. Civ. 73–586–E and representative of the plaintiff class in this consolidated action, established that she is a lineal descendant of one of the original Kansas Delaware Indians. One of the names appearing on the "Article IX Register" is Annie Grinter (Pl. Ex. 44). Annie Grinter was the great-grandmother of Wanda June Weeks (Transcript of Preliminary Injunction Hearing, 20, Pl. Ex. 15; Pl. Ex. 136a). Doro-

thy Frazier and Ruth Rattler, the plaintiffs in No. Civ. 74–368–D, alleged lineal descendancy through a Kansas Delaware named Lewis Ketchum (Plaintiffs Frazier and Rattler's Complaint, para. 5; Pl. Ex. 44), and established that they shared in the partial distribution of the award in Docket No. 337 (Pl. Ex. 136c and d).

**10.** The names of 985 Delawares appear on this register (Defendants Secretary and Cherokee Delawares' Ex. 23, pp. 73, 241. They are often referred to as "registered Delawares." The register is referred to as the "1867 Register."

127, 143, 24 S.Ct. 342, 48 L.Ed. 646), paid for by tribal funds,[11] and the right to become members of the Cherokee Nation. The Delaware Indians who removed to the Cherokee territory became members and citizens of the Cherokee Nation, but they and their descendants maintained group identity (Findings of fact Nos. 49 and 50, Docket No. 337).[12] The descendants of this group, who today reside in northeastern Oklahoma, comprise the defendant class Delaware Tribe of Indians, or the Cherokee Delawares.

The minor children of the adult Kansas Delawares did not immediately become United States citizens at the time of their parents' election under the 1866 Treaty. Rather, Article IX of the 1866 Treaty provided that they were to be considered temporarily severed from the tribe until they attained the age of twenty-one, at which time they too could make an election either to become citizens of the United States or remove to the Cherokee Delawares in Oklahoma. Until that time their just proportion of the Delaware tribal annuities was to be paid to their parents for the children's support and education. If thus admitted to citizenship upon reaching majority, such minors were to be entitled to "all the privileges and interests herein pro-

vided for the head of the family." Art. IX, 14 Stat. at 796.

By an Act approved June 22, 1874, ch. 389, 18 Stat. 146, 175, Congress appropriated funds to pay all the minor children of the adult Kansas Delawares their proportionate share of the money and stocks held in trust by the United States for the Delaware Tribe, and directed the Secretary of the Interior to issue a fee-simple title to the lands allotted them under the 1866 Treaty. By this same Act Congress also declared all such minors to be citizens of the United States, thus eliminating the requirement of an election.[13]

*Docket No. 337—25 U.S.C.A. §§ 1181–86*

In 1951 a suit was filed in the Indian Claims Commission by two members of the Absentee Delaware Tribe of Oklahoma on behalf of all the descendants of the Delaware Nation as constituted in 1818 to redress the wrong committed by the United States under the 1818 Treaty. The Commission found that the value of the lands in the Kansas reservation given by the United States in the 1829 supplemental treaty, together with other cash payments and gratuitous expenditures determined to be proper offsets, was insufficient consideration for the

---

11. As noted, the 1866 Treaty, 14 Stat. 793, provided that the United States would use the proceeds from the sale of the diminished reserve to purchase the Cherokee lands (Art. IV). Actually, only the lands not allotted to the Kansas Delawares were to be sold.

 The diminished reserve consisted of land which was held in severalty in 80-acre allotments and land held in common by the tribe. The 1866 Treaty provided that each Delaware removing to the Indian country would receive (in addition to the life estate in 160 acres of Cherokee land) the "value" of his 80-acre allotment in the diminished reserve, plus the "value" of any improvements he had made thereon (Art. III and VI). Apparently the purchase of the Cherokee lands was to be made from the proceeds of the sale of the lands held in common (Art. IV and VI). The residue of the proceeds of the sale of the diminished reserve was to be added to the general Delaware tribal fund (Art. VI), which already contained the proceeds of the sale of the trust lands.

And, as previously discussed, each Kansas Delaware was to receive his proportionate share of this fund (Art. IX).

 Dockets Nos. 72 and 298 concerned only the improper disposition of the trust lands under the 1854 Treaty, and did not concern this sale of the diminished reserve provided for by the 1866 Treaty. See Findings of fact Nos. 2 and 4.

12. The Kansas Delawares deny that such tribal identity has been maintained by the Cherokee Delawares and claim instead that the identity of the Cherokee Delawares was lost as a group when they became absorbed into the Cherokee Nation. We are unable to agree, and find that the Cherokee Delawares have maintained group identity, having tribal chiefs and business committees continuously until the present time.

13. The pertinent provision of the 1874 statute is reproduced in Part C of the Appendix to this opinion.

Delaware cession of its Indiana lands in 1818. The petitioners were awarded $1,627,244.64 "on behalf of the Delaware Nation of Indians as constituted at the time of the Treaty of October 3, 1818." (Final Judgment, Docket No. 337).

By 25 U.S.C.A. §§ 1181–86 Congress adopted a distribution plan for payment of this judgment entered in Indian Claims Commission Docket No. 337. Section 1181 of that Act provides that persons are eligible to participate in the distribution of the award if, *inter alia*, their name or the name of a lineal ancestor (1) appears on the 1906 Delaware per capita payroll (which covers the Cherokee Delawares); (2) is on or eligible to be on the 1940 constructed base census roll of the Absentee Delaware Tribe; or (3) appears on any available census roll or records acceptable to the Secretary,

provided that such claimant shows that he is a lineal descendant of Delawares who were members of the Delaware Nation as constituted at the time of the 1818 Treaty (hereafter the "catchall" clause).[14]

The statute's effect was to permit the Cherokee Delawares, the Absentee Delawares, and the Kansas Delawares to share in the distribution of the Docket No. 337 award. Some of the judgment funds were actually distributed to members of those classes prior to the issuance of our preliminary injunction.[15] Some 1500 Munsee Indians applied for payments under the award in Docket No. 337, but were denied participation by the Bureau of Indian Affairs at the area level. Hearings on H.R. 5200 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular

---

**14.** 25 U.S.C.A. § 1181 provides in pertinent part:

The Secretary of the Interior shall prepare a roll of all persons who meet the following requirements for eligibility: (a) They were born on or prior to and living on September 21, 1968; (b) their name or the name of a lineal ancestor appears on the Delaware Indian per capita payroll approved by the Secretary on April 20, 1906, or (c) their name or the name of a lineal ancestor is on or is eligible to be on the constructed base census roll as of 1940 of the Absentee Delaware Tribe of Western Oklahoma, approved by the Secretary of the Interior, or (d) they are lineal descendants of Delaware Indians who were members of the Delaware Nation of Indians as constituted at the time of the Treaty of October 3, 1818 (7 Stat. 188), and their name or the name of a lineal ancestor appears on any available census roll or any other records acceptable to the Secretary. No person shall be eligible to be enrolled under this section who is not a citizen of the United States.

**15.** See Plaintiff Weeks' Complaint, para. 15; Defendant Cherokee Delawares' Answer, Twelfth Defense, para. 15; Defendants Secretary and Absentee Delawares' Answer, para. 15; Transcript of Preliminary Injunction Hearing, 111, Pl. Ex. 15.

The claims by the Cherokee Delawares were made through the 1906 per capita payroll referred to in § 1181(b). This payroll was compiled for the purpose of distributing $150,000 appropriated by Congress as settlement for twelve lawsuits filed by the Cherokee Dela-

wares against the United States. Act of April 21, 1904, 33 Stat. 189, 222. One of the suits concerned the hunting "outlet" in Kansas that was ceded by the Delawares to the United States under the 1854 Treaty. See *United States v. Delaware Tribe of Indians*, 427 F.2d 1218, 1229, 192 Ct.Cl. 385 (1970). A number of the Kansas Delawares contended that they were entitled to share in this settlement, but were denied participation on grounds similar to some of those argued in the present case, including, *inter alia*, the fact that the 1904 Act (appropriating the funds) directed that payment was to be made only to the "Delaware Tribe of Indians residing in the Cherokee Nation" (33 Stat. 189, 222). See Defendants Secretary and Cherokee Delawares' Ex. 18, Ltr. of 1/25/1905, p. 2; Ltr. of 3/22/1905, p. 2. As a result, the 1906 per capita payroll (also referred to in 25 U.S.C.A. § 1292(c)(1)) limited the distribution of the settlement to only those Delawares who were descendants of the original 985 registered Delawares enrolled on the 1867 Register (i. e., the Cherokee Delawares). *Id.*, Ltr. of 8/14/1905, p. 1; Ltr. of 1/12/1906, p. 2.

The Absentee Delawares made their claims under § 1181(c). A 1956 Resolution of the Absentee Delaware Tribe provides that the January 1, 1940 census roll shall be used as the base for determining tribal membership. The "constructed base census roll" was formed by taking the names of persons shown to be of Delaware blood and adding thereto the names of persons, such as brothers or sisters, who were eligible to be on the 1940 census roll but were not listed (Defendants Secretary and Cherokee Delawares' Ex. 4, p. 12).

Affairs, 92d Cong., 2d Sess. 95–96 (March 13, 1972) (Pl. Ex. 6).

The plaintiff Kansas Delawares do not contest the Absentees' right to share in Docket No. 337 relating to the 1818 wrong but they do challenge the inclusion of the Cherokee Delawares in the distribution of this award, as well as that relating to the 1854 wrong, on two Fifth Amendment grounds. Essentially they argue that the inclusion of the Cherokee Delawares in the distribution of the award in Docket No. 337 (1) invidiously discriminates against those persons who are entitled to share in the award (i. e., the Kansas Delawares and the Absentee Delawares), and (2) deprives such persons of their property without just compensation.

### Dockets Nos. 72 and 298—25 U.S.C.A. §§ 1291–97

The Absentee Delawares in Docket No. 72, and the Cherokee Delawares in Docket No. 298, brought separate identical suits in the Indian Claims Commission for a general accounting upon all Delaware treaties with the United States. In previous proceedings the Commission had decided, and the Court of Claims had agreed, that both groups were entitled jointly to represent the entire Delaware Tribe.[16] Hence, the two cases before the Commission were consolidated.

Although originally filed as a general accounting, the issue in the case was subsequently narrowed to an accounting for that part of the 1854 Treaty concerning what was known as the Delaware trust lands. It was conceded by the Government, and the Commission found, that in 1856 and 1857 the United States did not carry out the treaty provision calling for the sale of the trust lands at public auction. The principal issue tried was how much additional monies the trust lands would have brought if the treaty had not been breached, and the lands had been properly sold at auction. The Commission determined that amount to be $1,385,617.81. It further found that the plaintiffs were entitled to recover damages of five (5) percent per annum simple interest on the principal sum from April 30, 1857 to the date of payment. As of August 31, 1969, the principal sum plus interest totaled $9,168,171.13.[17]

By 25 U.S.C.A. §§ 1291–97 Congress adopted a plan for distribution of the award entered by the Indian Claims Commission in Dockets Nos. 72 and 298. Section 1292 of the Act provides only two methods by which persons may show they are eligible to share in the distribution: (1) by the 1906 per capita payroll embracing the Cherokee Delawares; and (2) by the 1940 census roll of the Absentee Delawares.[18] These two rolls, identi-

---

The Kansas Delawares could not, of course, base their claims under the 1906 per capita payroll. Their ancestors did not remove to the Cherokee lands and did not sign the 1867 Register of Cherokee Delawares. Nor could the Kansas Delawares claim under the Absentees' 1940 census roll. Their claims in Docket No. 337 were and are based upon the "catchall" clause in § 1181(d), since, by historical fact, they are lineal descendants of the Delaware Nation as constituted in 1818.

16. See *Delaware Tribe of Indians v. United States*, 128 F.Supp. 391, 399, 130 Ct.Cl. 782 (1955).

17. On September 10, 1969, the Indian Claims Commission ordered that

the plaintiffs shall have and recover of and from the defendant as a final judgment the sum of $9,168,171.13 plus an additional

amount of damages measured by simple interest at the rate of 5% per annum on the principal sum of $1,385,617.81 from August 31, 1969 to the date of payment of the principal sum. (Final Award, Dockets Nos. 72 and 298.)

18. 25 U.S.C.A. § 1292 provides:

The Secretary of the Interior shall prepare a roll of all persons who meet the following requirements:

(a) they were born on or prior to and were living on October 3, 1972; and

(b) they are citizens of the United States; and

(c)(1) their name or the name of a lineal ancestor appears on the Delaware Indian per capita payroll approved by the Secretary on April 20, 1906, or (2) their name or the name of a lineal ancestor is on or is eligible to be

cal to those in 25 U.S.C.A. § 1181(b) and (c), allow only the Cherokee and Absentee Delawares to participate in the distribution of the award in Dockets Nos. 72 and 298. Section 1292 contains no "catchall" provision similar to 25 U.S. C.A. § 1181(d) that would enable the Kansas Delawares to share in the fund by showing their lineage from Delaware ancestors who were members of the tribe at the time of the wrong under the 1854 Treaty.[19]

The Kansas Delawares, reported to us as numbering over 600, note 3, supra, challenge their exclusion from § 1292 as an invidious classification in violation of the Due Process Clause of the Fifth

Amendment and equal protection principles applied under the Amendment. It is this constitutional claim which we are persuaded to uphold.

The plaintiff Kansas Delawares also challenge their exclusion from distribution under § 1292 on another Fifth Amendment ground—that the exclusion amounts to a taking of their vested rights without just compensation.

▮ Finally, they challenge the inclusion of the Absentee Delawares and the Cherokee Delawares in the distribution of the award, it again being argued that such inclusion discriminates against the Kansas Delawares and deprives them of property without just compensation.[20]

---

on the constructed base census roll as of 1940 of the Absentee Delaware Tribe of Western Oklahoma, approved by the Secretary.

19. Despite the restrictive terms of the statute, plaintiff Weeks applied for participation in the award in Dockets Nos. 72 and 298 (Pl. Ex. 136a). Her application was rejected by the Bureau of Indian Affairs, and her appeal therefrom was denied by the Department of the Interior (Pl. Ex. 4).

20. Section 1294 of the Act divides the Dockets Nos. 72 and 298 funds between the Absentee and Cherokee Delawares on a per capita basis. Ninety (90) percent of the funds apportioned to each of the two groups is to be paid out to individuals on a per capita basis. The other 10% remains to the credit of the governing bodies of each of the respective tribes to be expended for uses approved by the Secretary.

In addition to their other objections to all of the plaintiff Kansas Delawares' claims, the Absentee Delawares have moved for partial final judgment under Rule 54 F.R.Civ.P. as to the 10% of the portion of the award to remain to the credit of the Absentee Delaware Tribe of Western Oklahoma pursuant to § 1294(a). Their position is that the plaintiff Kansas Delawares have waived any claim as to said 10% of the portion of the award remaining to the credit of the Absentee Delaware Tribe, pointing to a letter introduced by plaintiffs, from the Assistant Solicitor for Indian Affairs, Department of the Interior, to plaintiffs' counsel (Pl. Ex. 137). The letter states that approval of attorneys fee contracts is not required on the specific understanding that you do not seek for your clients any part of the judgment funds in Dockets 72 and 298 which are reserved for tribal use by . . . 25 U.S.C. § 1291 et seq., but rather seek only their participation in the per capita distribu-

tions authorized by [25 U.S.C.A. §§ 1181–86 and 1291–97). . . .
They also argue that plaintiffs' various instruments filed in this case have not asserted a claim against the 10% portion set aside for the Absentee tribal body.

We are denying the motion for partial final judgment. Regardless of whether such waiver occurred, based on the pleadings of plaintiffs it is clear the Kansas Delawares have challenged the constitutionality of the statute and have asked that we enjoin distribution under it. See Plaintiffs' Brief on Motion for Partial Final Judgment for Absentee Delaware Tribe of Western Oklahoma, at 5 (filed 7/9/75); Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at 70, 71 and 73. For reasons stated in Part V of this opinion, we must hold that 25 U.S.C.A. §§ 1291–97 is not severable, and that the unconstitutional exclusion thereby of the Kansas Delawares renders the statute invalid as a whole.

With respect to the Cherokee Delawares, the position of the plaintiffs is not clear as to the 10% provision in § 1294(b). See Brief of Plaintiff in Support of Motion for Summary Judgment, at 11–12 (filed 4/16/74). Nevertheless, as stated, the plaintiffs do attack the constitutionality of the distribution statute, at least because of their exclusion, and ask that distribution under the Act be enjoined.

In § 1294(b) there is a proviso that the Secretary shall not approve the use of the funds given to the Cherokee Delaware Tribe until the tribe has organized a legal entity which in the judgment of the Secretary adequately protects the interest of its members. We have been informed by a recent certificate that the Secretary has made such finding with respect to the Delaware Tribal Business Committee. We are asked by the Cherokee Delawares to approve the finding, but that function is not within our issues or appropriate in our disposition and we are denying the motion for this relief.

For reasons discussed in Part IV we do not agree with these latter objections of the Kansas Delawares to the inclusion of the Cherokee Delawares and the Absentee Delawares in the distribution of the awards.

We turn from this factual background to the legal issues that are raised.

## II

## JURISDICTION AND JUSTICIABILITY

By numerous motions the defendants have asserted that this court is without jurisdiction of the subject matter and that only nonjusticiable issues are presented. Essentially they argue that the case does not present a substantial federal question because it involves only an intra-tribal dispute not subject to judicial review. They urge two distinct theories of sovereign immunity. They argue nonjusticiability, claiming that plaintiffs raise only political questions concerning the plenary power of Congress to define Indian tribal membership, and that plaintiffs challenge non-reviewable appropriation statutes. We are not persuaded that the theories bar decision of the merits of the constitutional claims of the plaintiff Kansas Delawares.

### Subject Matter Jurisdiction and The Intra-Tribal Dispute Cases

First, defendants assert that there is no substantial federal question presented, arguing that this controversy involves only intra-tribal matters not within the jurisdiction of the court, citing *Groundhog v. Keeler,* 442 F.2d 674 (10th Cir.); *Martinez v. Southern Ute Tribe,* 249 F.2d 915 (10th Cir.); *Prairie Band of Pottawatomie Tribe of Indians v. Puckkee,* 321 F.2d 767 (10th Cir.) and *Prairie Band of Pottawatomie Tribe of Indians v. Udall,* 355 F.2d 364 (10th Cir.), among other cases.

█ The complaints allege, *inter alia,* that the statutory exclusion of the Kansas Delawares was an unconstitutional and arbitrary deprivation of valuable property rights and a denial of equal protection, depriving plaintiffs of due process in violation of the Fifth Amendment (Plaintiff Weeks' Complaint, paras. 21 and 23; Plaintiffs Frazier and Rattler's Complaint, paras. 13 and 25). These averments and the complaints as a whole present causes of action clearly arising under the Federal Constitution and within the jurisdictional grant in 28 U.S.C.A. § 1331. See *Baker v. Carr,* 369 U.S. 186, 198–99, 82 S.Ct. 691, 7 L.Ed.2d 663. Defendants challenge jurisdiction, however, contending that the cases cited demonstrate lack of a substantial federal question because only an intra-tribal dispute is involved.

Defendants rely heavily on *Groundhog v. Keeler,* 442 F.2d 674 (10th Cir.). The court there dismissed a challenge to a chief's appointment under a federal statute authorizing the President to appoint the Principal Chief of the Cherokee Tribe. The court reviewed authorities recognizing "that Congress has exclusive and plenary power to enact legislation with respect to the Indian Tribes." *Id.* at 678. It was concluded that a jurisdictional dismissal was appropriate since the claim was "so lacking in substance and so contrary to the well established law" that it afforded no substantial basis for federal jurisdiction, citing *California Water Service Co. v. City of Redding,* 304 U.S. 252, 255, 58 S.Ct. 865, 82 L.Ed. 1323, and *Ex parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152. See 442 F.2d at 678, n. 7.

We recognize the validity of the conclusion upholding congressional power to authorize the appointment of the chief. However, our cases are not disposed of by such reasoning. We do not find any authority unmistakably sustaining congressional authority to exclude one group of Indian descendants from benefits conferred broadly on others who apparently stand on equal footing. No previous decisions make it clear that the constitutional claims before us are obviously without merit. *Levering & G. Co. v. Morrin,* 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062.

For similar reasons we find the remaining authorities and arguments unpersuasive as a challenge to jurisdiction. *Martinez, supra,* and *Puckkee, supra,* involved controversies between individual Indians and tribal entities over the official actions of the tribe. The cases are readily distinguishable since the challenges posed there were to a tribal decision or policy, and not to federal statutes. *Martinez* concerned an individual attack on a tribal decision excluding the plaintiff from tribal membership; *Puckkee* challenged the distribution of an Indian Claims Commission award where the distribution scheme fixed by the tribal council excluded the plaintiffs; and the *Prairie Band* case sought to bar approval of a tribal distribution plan. As the cases involved essentially intra-tribal disputes over decisions by tribal authorities, the courts found no substantial federal question arising under 28 U.S.C.A. § 1331. See *Martinez,* 249 F.2d at 919; *Puckkee,* 321 F.2d at 770; *Prairie Band,* 355 F.2d at 367. In contrast, this action involves a substantial challenge to congressional rather than tribal action.[21]

■ We are persuaded that the Kansas Delawares present substantial constitutional claims under the Due Process Clause—claims deserving consideration on their merits. And since we are also convinced that the claims are justiciable, as explained below, we feel the case is properly here under 28 U.S.C.A. § 1331. See *Baker v. Carr,* 369 U.S. at 198, 82

S.Ct. 691; see also, *Powell v. McCormack,* 395 U.S. 486, 512–13, 89 S.Ct. 1944, 23 L.Ed.2d 491.[22]

### Sovereign Immunity

■ The defendants' motion to dismiss the suit as against the United States has been granted since there is no consent to such a suit. [Order, Nov. 1, 1974]. The situation differs, however, with respect to the case against the Secretary. The doctrine of sovereign immunity does not insulate federal offficers from suit when the case seeks to enjoin threatened action by a federal officer under an unconstitutional statute. See *Larson v. Domestic and Foreign Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628. We therefore rejected the governmental sovereign immunity defense as to the Secretary.

■ In our Weeks case it is objected that the tribal business committees which are sued are immune from suit. It is true that the Indian Nations are exempt from suit without congressional authorization. *United States v. U. S. Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894; *Turner v. United States,* 248 U.S. 354, 358, 39 S.Ct. 109, 63 L.Ed. 291. Nor may a tribe be sued indirectly by suing tribal officers or the United States as trustee or guardian of the tribe. *Barnes v. United States,* 205 F.Supp. 97, 100 (D.Mont.).

---

**21.** Although the controversy here might be denominated one as to "tribal membership" in the broad sense of the term, that alone does not render it an "intra-tribal" dispute. The *Martinez* opinion itself recognized that the question of tribal membership for disposition of funds could, as a result of federal legislation, become a matter of federal rather than tribal supervision. See 249 F.2d at 918, 920.

**22.** In their answers defendants deny the jurisdictional amount allegations. However, the objection has not been pressed by argument or brief and we find it without merit.

As discussed above, this case properly proceeds as a Rule 23(b)(1)(B) class action. The decisions in *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 and *Zahn v. Inter-*

national Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511· impose prohibitions against aggregation of claims in class actions. Those decisions,· however, concern Rule 23(b)(3) class actions and present no obstacle to the aggregation of claims when a common and undivided interest is present. *Gallagher v. Continental Insurance Co.,* 502 F.2d 827, 831 (10th Cir.); see also *Berman v. Narragansett Racing Association,* 414 F.2d 311, 314–15 (1st Cir.), cert. denied, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681. Should the plaintiff class of Kansas Delawares prevail in this litigation, their right to share in the benefit of the award will have been determined. Still a formula will have to be determined by statute and no individual recoveries can be, or are now, sought. See *Berman, supra* at 315–16.

However, the Weeks complaint alleges as to the Cherokee Delaware and Absentee Delaware committees that each of the members of the committee (being separately named) is a Delaware Indian and that they are each a representative of their respective subclasses, the Cherokee Delawares and the Absentee Delawares. The Indian defendants are not immune from suit in their individual capacities. See *Chemah v. Fodder,* 259 F.Supp. 910, 914 (W.D. Okl.). We feel we may entertain the suit against the individually named Indian defendants, in their individual capacities, and that we may also properly recognize them as representatives for class action purposes under Rules 23(b)(1)(B) and 23(b)(2) and enter a proper declaratory judgment of the right of the individuals constituting the classes. We grant no relief against the tribes or their tribal authorities as such, and our judgment should not be construed as a binding adjudication affecting them.

### The Argument of Non-Justiciability and the Plenary Power of Congress Over the Status of Indian Tribes

Defendants argue that only non-justiciable issues are presented due to implication of the plenary power of Congress to define Indian tribal membership.

Without doubt, plenary authority has been exercised by Congress from the beginning over tribal relations of the Indians and the power has been deemed a political one, not subject to control by the judicial department. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299; see also *National Indian Youth Council v. Bruce,* 485 F.2d 97, 99 (10th Cir.). However, we are cautioned that "[m]uch confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry." *Baker v. Carr,* 369 U.S. 186, 210–11, 82 S.Ct. 691, 706, 7 L.Ed.2d 663. As in other contexts, there is no blanket rule as to justiciability where legislation affecting the status of Indians is challenged. *Id.* at 215–16, 82 S.Ct. 691. Analysis must be made of the threads of the political question doctrine to determine whether they catch this controversy. *Id.* at 211, 82 S.Ct. 691. Generally, we must first consider whether the constitutional claim presented and relief sought are of the type permitting judicial resolution, and second, whether there may be a "political question" that is not justiciable because of the separation of powers. *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 23 L.Ed.2d 491.

In considering the first question, we note that the constitutional claims essentially are that the distribution statutes violate the Fifth Amendment's protections against unlawful taking and against denial of due process, implicating equal protection principles. See *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 n. 2. Such a claim of discriminatory classification is of a type regularly considered and decided by the courts. As the Court observed in rejecting the non-justiciability argument in *Baker v. Carr,* 369 U.S. at 226, 82 S.Ct. at 715:

> Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.

Moreover, the relief sought is not unfamiliar. An injunction against threatened unconstitutional action by a governmental officer is within the proper equitable remedies of the court, see *Lane v. Pueblo of Santa Rose,* 249 U.S. 110, 113–14, 39 S.Ct. 185, 63 L.Ed. 504, and the separate remedy of a declaratory judgment is also familiar. *Powell v. McCormack,* 395 U.S. 486, 517–18, 89 S.Ct. 1944, 23 L.Ed.2d 491. We are convinced that the first general test of justiciability is satisfied.

Our second inquiry—whether there is a non-justiciable "political question" because of constitutional separation of powers—involves more detailed consider-

ations. We must consider whether there is a bar to judicial disposition because of a constitutional commitment of the issue to a coordinate political department, lack of judicially discoverable and manageable standards for resolving the question, or an impossibility of decision without an initial policy determination of a kind clearly for non-judicial discretion, *inter alia.* See *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663; see also *Powell v. McCormack*, 395 U.S. 486, 518–19, 89 S.Ct. 1944, 23 L.Ed.2d 491.

Of course, there is explicit constitutional authorization for congressional action in dealing with Indian affairs in the provision for Congress "To regulate commerce . . . with the Indian Tribes." And the functions relating to treaties conferred on the President and the Senate by Art. II, § 2, Cl. 2, have often been the source of power to deal with the Indian Tribes. See *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290; *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172, n. 7, 93 S.Ct. 1257, 36 L.Ed.2d 129; see also *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565–66, 23 S.Ct. 216, 47 L.Ed. 299.

The authority conferred upon the other branches for dealing with the Indian Tribes by treaty is involved indirectly in this case in the sense that the historical background for the Delaware awards in question include several treaties with the Tribe, as discussed earlier. There is, however, in the distribution statutes no present policy determination of the sort involving the treaty making function. Instead these recent enactments deal with equitable distribution following a judicial award, and proper classifications for the distribution. There is the additional view that enactments dealing with Indians involve the relationship of a ward to his guardian, and there is an element of such a relationship touched on by § 1294.[23] *Baker v. Carr*, 369 U.S. 186, 215, 82 S.Ct. 691, 7 L.Ed.2d 663; see also *Lone Wolf v. Hitchcock*, 187 U.S. 553, 567, 23 S.Ct. 216, 47 L.Ed. 299. However, the challenge to the classifications made here does not refer to the guardianship relation, nor to the discretionary exercise of the guardianship function by the Congress.

We have touched earlier on the availability of familiar standards for deciding the constitutional claims presented here. We are persuaded that the claims invoke familiar due process and equal protection principles. In several instances the courts have reached the merits of due process claims of a similar sort. *E. g., United States v. Jim*, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282; *Ute Indian Tribe v. Probst*, 428 F.2d 491, 498 (10th Cir.), cert. denied, 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186; *Simmons v. Seelatsee*, 244 F.Supp. 808, 815 (E.D.Wash. 1965) (three judge court), aff'd mem., 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480; see also *McCurdy v. Steele*, 353 F.Supp. 629, 637–38 (D.Utah 1973), rev'd on other grounds, 506 F.2d 653 (10th Cir.).

Nor do any of the remaining considerations underlying the political question doctrine apply. Decision on the precise constitutional issues does not involve any disrespect for a political decision by a coordinate branch. And, of course, there is no danger of embarrassment by multifarious pronouncements by two branches as in foreign affairs. See *Baker v. Carr*, 369 U.S. at 211–13, 217, 82 S.Ct. 691.

■ For these reasons we are satisfied that, on analysis, the political question doctrine does not bar consideration of the constitutional claims of the Kansas Delawares. They may invoke jurisdiction of the court under 28 U.S.C.A.

---

**23.** We refer to the provision in § 1294(a) and (b) that 10% of the award be withheld for subsequent advancement, expenditure, etc., for any purpose authorized by the tribal governing bodies of the Cherokee and Absentee Delawares and approved by the Secretary of the Interior. 25 U.S.C.A. § 1294(a), (b). This portion of the statute is affected by our decision only because of our conclusion that the distribution statute, which has no separability clause, must be held invalid as a whole. See Parts III and V, *infra.*

§ 1331 to decide the validity of the statutory exclusion and inclusions in light of established constitutional limitations. "[T]he power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." *United States v. Tillamooks,* 329 U.S. 40, 54, 67 S.Ct. 167, 174, 91 L.Ed. 29; see also *United States v. Klamath Indians,* 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219; *Chippewa Indians of Minnesota v. United States,* 301 U.S. 358, 375–76, 57 S.Ct. 826, 81 L.Ed. 1156; *United States v. Creek Nation,* 295 U.S. 103, 109–10, 55 S.Ct. 681, 79 L.Ed. 1331; *Stephens v. Cherokee Nation,* 174 U.S. 445, 578, 19 S.Ct. 722, 43 L.Ed. 1041; F. Cohen, Handbook of Federal Indian Law 91 (orig. ed. 1942).

### The Objection to Justiciability on the Theory of Nonreviewability of Appropriation Statutes

The Absentee Delawares advance a final argument that nonjusticiable questions are involved because appropriation statutes are challenged, relying on *United States v. Price,* 116 U.S. 43, 6 S.Ct. 235, 29 L.Ed. 541 and *United States v. Jordan,* 113 U.S. 418, 5 S.Ct. 585, 28 L.Ed. 1013. The plaintiff Kansas Delawares reply that appropriation statutes are not involved. They say that the determination to pay the awards was made in earlier, separate appropriation acts, Pub.L. No. 88–635, ch. IX, Oct. 7, 1964, 78 Stat. 1033–34; Pub.L. No. 91–167, ch. IX, Dec. 26, 1969, 83 Stat. 453, and that the challenged distribution statutes are not appropriation acts. Without deciding this point we consider the argument on the basis that the distribution statutes under attack are a part of the appropriation procedure.

■ We conclude that the reasoning of the *Price* and *Jordan* cases does not apply. The cases involved determinations that restitution should be made for property taken for war-time purposes and by unlawful taxation, respectively. In both cases the government challenged a prior congressional determination by statute of the government's obligation. In *Jordan* the Court stated that the clear import of the statute was that the amount specified had been collected contrary to the tax regulations involved, and that this congressional determination, made on recommendation of the Secretary of the Treasury, could not be challenged in the subsequent suit. 113 U.S. at 423, 5 S.Ct. 585. Similar reasoning was relied on in the *Price* case.

■ We have also noted *Buchanan v. Patterson,* 190 U.S. 353, 23 S.Ct. 764, 47 L.Ed. 1093; *United States v. Louisville,* 169 U.S. 249, 18 S.Ct. 358, 42 L.Ed. 735, and *Kruszewski v. United States,* 163 F.2d 884 (7th Cir.), cert. denied, 333 U.S. 880, 68 S.Ct. 909, 92 L.Ed. 1155, which recognize the principles of *Price* and *Jordan.* In none of the cases, however, is there support for the inference that a statute, because it involves an appropriation function, is unreviewable if a substantial constitutional claim is made that an invidious or irrational classification or exclusion is made by the statute. And, of course, the fact that the spending power is involved does not bar consideration of constitutional issues. See *Helvering v. Davis,* 301 U.S. 619, 640–41, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *United States v. Butler,* 297 U.S. 1, 62–78, 56 S.Ct. 312, 80 L.Ed. 477 (1936); *Veazie Bank v. Fenno,* 8 Wall. (75 U.S.) 533, 541, 19 L.Ed. 482 (1869); cf. *Flast v. Cohen,* 392 U.S. 83, 127, 88 S.Ct. 1942, 20 L.Ed.2d 947 (Harlan, J., dissenting). We feel that involvement of the appropriation function is no bar to hearing the merits of the constitutional claims of those excluded by a classification asserted to be invidious and irrational.

Thus, we are convinced that substantial constitutional claims are asserted and that they deserve disposition on their merits. The claims are proper for consideration under familiar judicial standards and none of the facets of the political question doctrine bars judicial review.

## III

### CONSTITUTIONALITY OF THE EX-CLUSION OF THE KANSAS DEL-AWARES BY 25 U.S.C.A. §§ 1292 and 1294.

The plaintiff Kansas Delawares claim that the exclusion barring their participation in the award in Dockets Nos. 72 and 298, redressing the 1854 wrong, is irrational and invidious under the Due Process Clause, and the equal protection principles incorporated therein; and also that the statute takes their vested individual rights without just compensation. We find merit in plaintiffs' first claim, not agreeing however with their unlawful taking theory.[24]

■ In assessing the claim of the Kansas Delawares that the exclusion amounts to an irrational and invidious classification, we follow equal protection principles applied under the Fourteenth Amendment. See *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514, *Johnson v. Robinson*, 415 U.S. 361, 364–65 & n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389. Since no suspect classification or fundamental interest is involved, our inquiry is whether the classification excluding the Kansas Delawares is rationally related to a legitimate governmental interest, or whether it invalidly excludes a group standing on equal footing with others benefited. *Jimenez v. Weinberger*, 417 U.S. 628, 636–37, 94 S.Ct. 2496, 41 L.Ed.2d 363; see also *Weinberger v. Salfi*, 422 U.S. 749, 769, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522; *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed.2d 782; *Weber v.*

*Aetna Casualty & Surety Co.*, 406 U.S. 164, 172–73, 92 S.Ct. 1400, 31 L.Ed.2d 768; *Richardson v. Belcher*, 404 U.S. 78; 81–84, 92 S.Ct. 254, 30 L.Ed.2d 231; *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739.

■ We approach the question mindful of the presumption of constitutionality that the statute carries. *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435. As noted, the award in Dockets Nos. 72 and 298 seeks to redress a wrong to the Delaware tribe from the improper sales of tribal lands in 1856 and 1857. Since the excluded Kansas Delawares trace their descendancy from the injured tribe as of that time, a substantial question as to the rationality of the exclusion is raised. We turn, therefore, to the various justifications for the classifications that have been suggested or may be conceived. *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739.

■ The defendants argue that there are several justifications that serve as rational bases for the classifications drawn in 25 U.S.C.A. §§ 1292 and 1294. When the matter was before the Congress the arguments of the Cherokee and Absentee Delawares for the restrictive classifications centered heavily on their objections to claims of the Munsee groups and the delaying effect those claims had caused in distribution of the award in Docket No. 337 relating to the 1818 wrong. Due to the importance of the legislative history and its focus on the Munsee groups, we will first consider the legislative source materials.[25]

---

**24.** It is convenient to address plaintiffs' just compensation claim in Part V of this opinion dealing with equitable jurisdiction and remedies.

**25.** It is proper to examine the legislative history of a statute to see if it discloses a rational basis for the classifications made by the statute, see, *e. g., Richardson v. Belcher*, 404 U.S. 78, 82, 92 S.Ct. 254, 30 L.Ed.2d 231; *United States v. Maryland Savings-Share Ins. Corp.*, 400 U.S. 4, 6, 91 S.Ct. 16, 27 L.Ed.2d 4, as well

as other grounds of justification that may be conceived. *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739.

This court on its own motion, and with notice to the parties, requested and obtained a legislative history covering the two distribution statutes (25 U.S.C.A. §§ 1181–86 and 1291–97) involved in this case through the assistance of the Administrative Office of the United States Courts and the congressional

*The Legislative History and the
Munsee Groups*

As noted, the Kansas Delawares did share in the award in Docket No. 337, redressing the breach of the 1818 Treaty, by virtue of a catchall provision in the distribution statute including all persons who "are lineal descendants of Delaware Indians who were members of the Delaware Nation of Indians as constituted at the time of the Treaty of October 3, 1818 . . . ." 25 U.S.C.A. § 1181(d). Likewise the legislation originally introduced for the purpose of distributing the funds appropriated to pay the award in Dockets Nos. 72 and 298, redressing the breach of the 1854 Treaty, would have included the Kansas Delawares since it proposed to bring current and amend the distribution rolls developed pursuant to 25 U.S.C.A. § 1181 so as to include all persons who were lineal descendants of members of the Delaware Tribe as it existed in 1854. H.R. 5200, 92d Cong., 1st Sess. § 2 (March 1, 1971); S. 1067, 92d Cong., 1st Sess. § 2 (March 2, 1971).[26]

However, the bill which was ultimately passed by Congress, H.R. 14267, 92d Cong., 2d Sess. (1972) (as amended), narrowed the distribution provision. The distribution scheme finally enacted followed the scheme for Docket No. 337, 25 U.S.C.A. § 1181, except for the crucial

difference that the third or catchall provision in § 1181(d) which had allowed the Kansas Delawares to share was omitted from § 1292. Only persons who could trace their ancestry to a described 1906 payroll (*i. e.*, the Cherokee Delawares), or whose name or whose ancestor's name was on, or was eligible to be on, the constructed base census roll as of 1940 of the Absentee Delawares, were included under this distribution provision.

We have examined the legislative history relating to this change in the distribution provisions. The change was made after the Cherokee Delawares and Absentee Delawares objected to the distribution provisions in the bills originally introduced. The substitute distribution provision which was adopted was essentially that proposed by the two tribal groups.[27]

The Cherokee and Absentee Delawares advanced several reasons to Congress for rejecting the distribution provision in the bills originally introduced and adopting instead their narrower proposal referring to the 1906 roll and the constructed roll as of 1940.[28] The underlying problem, which was cited repeatedly, concerned the Munsee groups. The Munsees were conceded to share common origins with early Delawares in New Jersey, Pennsylvania and Maryland, to whom they were considered related and with whom they

---

staffs. These materials were filed with the clerk of the court for examination and comments by the parties.

26. The use of the updated roll in H.R. 5200 was recommended by the Department of Interior. See House Committee Report accompanying H.R. 14267, H.R.Rep. No. 92–1081, 92d Cong., 2d Sess. 2 (1972) (Defendants Secretary and Cherokee Delawares' Ex. 6).

27. See Hearings on H.R. 5200 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess. 31 ff.; (March 13, 1972) (Pl. Ex. 6) [hereinafter cited as House Subcomm. Hearings]; Hearings on H.R. 5200, H.R. 14267 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess. 4 (May 8, 1972) (Pl. Ex. 7).

28. See *e. g.*, Letter from Bruce M. Townsend, Chairman of the Delaware Tribal Business

Committee (Cherokee Delawares), to Congressman Wayne H. Aspinall, Chairman, House Comm. on Interior and Insular Affairs, Nov. 16, 1971, attached to House Subcomm. Hearings, *supra* n. 27, at 9 ff.; Statement of Louis L. Rochmes, Attorney for the Delaware Tribes, March 13, 1972, attached to House Subcomm. Hearings, *supra* n. 27, at 45 ff.; House Subcomm. Hearings, *supra* n. 27, at 10, 14–18, 21–22, 25, 46–49, 71–74 (testimony of Bruce M. Townsend and Louis L. Rochmes); Hearings on H.R. 14267, H.R. 5200 Before the Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess. 4–5 (May 10, 1972) (Pl. Ex. 8); Hearings on S. 3113, S. 1067, S. 2249 and S. 2298 Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess. 42–49, 60–61, 69–71 (July 21, 1972) (Pl. Ex. 5) (testimony of Bruce M. Townsend, Harold Pruner and Lawrence Snake).

formed one cultural group. At least some officials in the Bureau of Indian Affairs had taken the position that certain Munsee Indians should qualify to share in the award in Docket No. 337 under the catchall provision in 25 U.S. C.A. § 1181 covering all lineal descendants of the 1818 Delaware Nation. The Bureau had indicated that these Munsees might apply for participation in the distribution under this provision and extended various administrative deadlines in order to allow the Munsees to make such applications. It ,appears that some 1500 Munsees ultimately applied to participate in the award in Docket No. 337, that all 1500 applications had been rejected by the Bureau at the area level, and that some 739 were still pending on appeal at the Bureau in Washington at the time of the hearings on legislation to distribute the award in Dockets Nos. 72 and 298. See House Subcomm. Hearings, *supra* n. 27, at 95–96.

The Cherokee and Absentee Delawares objected that the Munsee Indians, including the Christian Munsees, were not, in fact, descendants of the Delaware Nation as it was constituted in 1818 or in 1854, and that the Bureau's actions in their behalf were unfounded. See House Subcommittee Hearings, *supra* n. 27, at 56–57, 72. Moreover, they objected that there was Bureau solicitation of the Munsees to apply and that subsequent extensions of deadlines for the Munsees' benefit, coupled with the volume of appeals produced when the Munsee applications were rejected, had unreasonably delayed the complete distribution of the

funds in Docket No. 337. They argued that the use of a similar "lineal descendants" provision in the new distribution act for the award in Dockets Nos. 72 and 298 would lead to a repetition of the Munsee problem and that a precise definition of the identity of those entitled to share in the latter award was therefore necessary. See the Letter of Mr. Townsend and Statement of Mr. Rochmes cited n. 28 *supra*. Other reasons for the restriction of the award to the Cherokee and Absentee Delawares were also urged and they are considered below in discussing the various bases·said to justify the exclusion of the Kansas Delawares.

The Munsee situation was undoubtedly a major factor in Congress' decision to drop the catchall "lineal descendants" provision in § 1292. However, the legislative history indicates that Congress was never apprised that adoption of the Cherokee and Absentee Delaware proposals for limiting the distribution provisions would have the effect of excluding a group of people, such as the Kansas Delawares who were unquestionably lineal descendants of the Delaware Nation of 1854, who had lived on the Kansas Delaware lands, and who had not participated in any judgment to another tribe.[29]

As stated, the Congress adopted basically the position of the Absentee and Cherokee Delawares that the award in Dockets Nos. 72 and 298 be divided between their two groups. The committed reports accompanying the pending proposal H.R. 14267 stated that "[t]he Delaware Indians are divided into two groups: the Delaware Tribe, and the Ab-

---

**29.** See the statement by Mr. Rochmes, tribal attorney for the Absentee and Cherokee Delawares in response to questions by the committee (House Subcomm. Hearing, *supra* n. 27, at 78–80), Appendix to this opinion, Part A.

There is evidence in our record that at least some of the Cherokee and Absentee Delawares, themselves, were unaware of the existence of the Kansas Delawares at the time they testified before Congress. Mr. Townsend, the Chairman of the Delaware Tribal Business Committee (Cherokee Delaware) and one of the principal witnesses before Congress urging the adoption of a distribution scheme utilizing only the 1906 and 1940 rolls, testified in the

course of this litigation that he was unaware of the existence of the Kansas Delawares, as such, until after the passage of 25 U.S.C.A. §§ 1291–97, when it was discovered that the Kansas Delawares were precluded from sharing in the award under the statute. Transcript of Preliminary Injunction Hearing, 76, 91, Pl. Ex. 15. Mr. Townsend further testified that he did not think the question of the Kansas Delawares' sharing in the award in Dockets Nos. 72 and 298 was ever brought before or considered by Congress in the course of the legislative hearings on distribution legislation for the award. *Id.* at 82–85.

sentee Delaware Tribe of Western Oklahoma." H.R.Rep. No. 92–1081, 92d Cong., 2d Sess. 1 (May 22, 1972); S.Rep. No. 92–1126, 92d Cong., 2d Sess. 1 (Sept. 14, 1972) (Defendants Secretary and Cherokee Delawares' Ex. 6 and 7 respectively). The House Report states that the recommendations of the Department of Interior (which had proposed up-dating the Docket No. 337 roll to include persons who are lineal descendants of the Delaware Tribe as it existed in 1854) were strenuously opposed by both groups (the Absentee and Cherokee Delawares), and that "the Indian position is, in the opinion of the committee, a defensible one." *Id.* at 2. Neither the reports nor the floor proceedings of both Houses disclose further reasons or discussion for the classifications in the statute as enacted. See 118 Cong.Rec. S. 15063 (daily ed. Sept. 18, 1972); 118 Cong.Rec. H. 8700 (daily ed. Sept. 25, 1972).

From our examination of the legislative history we find that the Congress was specifically requested by the Absentee Delawares and the Cherokee Delawares to delete the catchall provision, and that Congress made the decision in response to the urging of those groups. On the record before us, we find that neither Congress nor its committees were made aware that the limitation of distribution to the two rolls would exclude a group which had lived on the Kansas Delaware lands and which could trace their Delaware descendancy as the Kansas Delawares do.[30] Instead the focus was on the Munsee Indian groups, including the Christian Indians,[31] and paramount consideration was given to the Munsee situation in considering the proposed change in the distribution statute.

▇▇▇ While we have no question of statutory interpretation before us mak-

ing germane the legislative history and intent in the usual context, we nevertheless feel these legislative materials are relevant in connection with defendants' claim that the Congress was aware that the classification would exclude some Indians who could ethnologically claim to be Delawares.[32] It is disturbing that the Congress was apparently not aware of the Kansas Delaware group and we are persuaded that it was not the intent of Congress to exclude a group such as the Kansas Delawares from the distribution.

### Suggested Rational Bases for the Exclusion of the Kansas Delawares in 25 U.S.C.A. §§ 1292 and 1294

We turn to the several justifications advanced by defendants as supporting the rationality of the exclusion of the Kansas Delawares from participation in the award redressing the 1854 wrong.

*First,* defendants rely on the references in 25 U.S.C.A. § 1292 to the 1906 Cherokee Delaware roll and the 1940 Absentee Delaware roll. They say that reference to these objective standards in preference to an ethnological standard of lineal descendancy was intentionally chosen to eliminate the possibility of wrongful payment due to deliberate misrepresentations or misunderstanding, to avoid delay, and to eliminate the confusion that had arisen in distribution of the Docket No. 337 award. See Defendants' Consolidated Proposed Findings of Fact and Conclusions of Law, 64. We cannot agree, concluding that the argument will not withstand analysis of the statutes and factual circumstances, or the constitutional protections against discriminatory classifications made clear by the Supreme Court.

We have noted earlier that complaints made to Congress in connection with delay and controversy, among other things, were directed at the Munsees,[33] and not

---

**30.** See Appendix to this opinion, Part B.

**31.** See Article 13 of the 1854 Treaty, 10 Stat. 1048.

**32.** See Defendants' Consolidated Proposed Findings of Fact and Conclusions of Law, p. 63 (as amended Oct. 3, 1975).

**33.** See Letter of Mr. Townsend and Statement of Mr. Rochmes cited n. 28 *supra.*

at the Kansas Delawares. The testimony indicated that approximately 300 Kansas Delawares shared in the earlier Docket No. 337 award redressing the 1818 wrong (Transcript of Preliminary Injunction Hearing, 103–04, Pl. Ex. 15), and the legislative history before us reflects no complaints of delay or controversy in connection with the participation by these Kansas Delawares in the distribution of that award.

 Moreover, in response to requests for deadlines to avoid delay, the enactment providing for distribution of the Dockets Nos. 72 and 298 award included limitations of four months for applications for enrollment, 60 days for rejection by the Secretary, 30 days for appeal, and 60 days for determination of an appeal, 25 U.S.C.A. § 1293. This protection against delay and controversy moots the substance of defendants' arguments. In these circumstances the suggested considerations of administrative convenience cannot support the exclusion of the Kansas Delawares. The arguments must fall in view of the admonition in *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551:

> The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy govern-

ment officials no less, and perhaps more, than mediocre ones.

 We are also unconvinced by the suggested rationale of avoidance of spurious claims. It is true that § 1292 refers to two existing 1906 and 1940 rolls. However, the suggested potential of spurious claims is not eliminated since the standards of entitlement were not confined within the compass of objective records. The Secretary was required by § 1292 to prepare a distribution roll of Absentees living on October 3, 1972, who were United States citizens, and who could show that:

> (2) their name or the name of a lineal ancestor is on or is eligible to be on the constructed base census roll as of 1940 of the Absentee Delaware Tribe of Western Oklahoma, approved by the Secretary. (25 U.S.C.A. § 1292(c)(2))

It is clear that under the § 1292 criteria an Absentee Delaware could apply for enrollment under § 1293 [34] and partake in the distribution of the award if he could show that his name or that of his "lineal ancestor" was on or was "eligible to be on" the constructed base census roll as of 1940. Thus it was open to an Absentee to show entitlement by ethnological proof of Delaware blood lines even though neither his name nor that of his ancestor actually appeared on the described roll.[35] This proof is not limited to objective records. Moreover, we note that both Cherokee and Absentee Delawares could show entitlement for § 1292 purposes if the name of their "lineal ancestor" was on the described rolls—a showing that again would involve tracing Delaware lineage subsequent to and outside the described rolls.

---

**34.** Applications are required to be made by § 1293 to an Area Director. The applications are considered by the Secretary under the § 1292 criteria to determine eligibility for listing on the distribution roll of persons entitled to share in the distribution of the award.

**35.** The method of preparation of the Absentee "constructed base census roll as of 1940" included listing persons shown to be of Delaware blood who were *eligible* to be on the

1940 roll of Caddos and Absentee Delawares, but were not listed. The method of preparation of the "constructed base census roll as of 1940 of the Absentee Delaware Tribe of Western Oklahoma approved by the Secretary of the Interior," 25 U.S.C.A. § 1181(c), is described in the Senate Report accompanying H.R. 16402 as follows (S.Rep. No. 1518, 90th Cong., 2d Sess. 12 (1968) (Defendants Secretary and Cherokee Delawares' Ex. 4)):

■ The prevention of spurious claims is recognized as a legitimate governmental interest in connection with classifications. See *Jimenez v. Weinberger*, 417 U.S. 628, 636, 94 S.Ct. 2496, 41 L.Ed.2d 363. Here, however, as in *Jimenez*, the effect of the statute is to create subclasses which are treated unequally. For example, members of the Absentee Delaware subclass can show entitlement to participate by proof of Delaware lineage, independent of any roll, through proof that an ancestor was "eligible" to be on the constructed base census roll as of 1940, although not listed. But members of the other subclass, consisting of those like the Kansas Delawares, are denied the opportunity to make a showing of entitlement through proof of Delaware lineage in any way on the suggested rationale that the statute furthers the interest of prevention of spurious claims. The rationale is untenable "since the potential for spurious claims is exactly the same as to both subclasses." *Jimenez v. Weinberger, supra*, 417 U.S. at 636, 94 S.Ct. at 2501.[36]

Thus, in the circumstances before us, we cannot agree that considerations of the avoidance of potential fraud, delay and controversy, or of easing administrative burdens, justify the discriminatory exclusion of the Kansas Delawares. See *Jimenez v. Weinberger, supra*, 417 U.S.

at 635–37, 94 S.Ct. 2496; *Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225.

■ *Second*, it was argued before Congress and the court that a proper reason for limitation of distribution of the award to the Cherokee Delawares and Absentee Delawares is found in the final award of Indian Claims Commission in Dockets Nos. 72 and 298. The argument is that whereas the award in Docket No. 337 was made to "the petitioners on behalf of the Delaware Nation of Indians as constituted at the time of the Treaty of October 3, 1818", the award in Dockets Nos. 72 and 298 was made to the "plaintiffs," who were the Cherokee and Absentee Delawares.

We cannot agree with the inference drawn from the form of the award. In its first finding of fact in Dockets Nos. 72 and 298 the Commission stated:

1. Plaintiffs, Absentee Delaware Tribe of Oklahoma et al. in Docket No. 72, and the Delaware Tribe of Indians in Docket No. 298, are entitled under the Act of August 13, 1946, 60 Stat. 1049, *to jointly represent the entire Delaware Tribe in its claim against the United States.* (emphasis added)

In addition the opinion of the Commission refers to its earlier determination (2

---

Membership in the Absentee Delaware Tribe is governed by a resolution adopted by the tribe on December 22, 1956, and approved by the Acting Assistant Commissioner on July 30, 1957. The resolution provides that the January 1, 1940, census roll shall be used as the base for determining membership in the tribe. That roll is the census of the Wichita and Affiliated Bands of Indians (Caddo and Absentee Delaware). In constructing the base census roll referred to in section 1(c) of the proposed bill, the tribe has taken from the 1940 roll the names of persons shown to be of Delaware blood and has included the names of persons, such as brothers and sisters, who were eligible to be on the 1940 roll but were not listed. The base roll which has not yet been approved lists 331 individuals. The executive committee estimates that the membership roll as of January 1, 1967, will contain approximately 800 names.

**36.** The dimensions of the problem viewed from the numbers of the three groups involved do not indicate that the Kansas Delawares would present more difficulties than the other groups. It was testified before us that the Bureau of Indian Affairs has advised that 7,765 Cherokee Delawares and 1,808 Absentee Delawares had been approved for participation in the award at the time of the preliminary injunction hearing in March, 1974 (Transcript of Preliminary Injunction Hearing, 109, Pl. Ex. 15). As earlier noted, it has been reported to us that the identities of approximately 678 Kansas Delawares were known to the plaintiff Weeks (see note 3 *supra*). Approximately 300 Kansas Delawares shared in the Docket No. 337 award, according to the testimony (Transcript of Preliminary Injunction Hearing, 103–04). And, as stated the complaints as to delay were related to the Munsee groups, not to the Kansas Delawares.

Ind.Cl.Comm. 253), that "these two groups were entitled jointly to represent the entire Delaware Tribe." 21 Ind.Cl. Comm. 344, 345.

The finding of the representative capacity in which the plaintiff groups brought suit accords fully with the procedure laid out by the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S. C.A. §§ 70–70v. The Commission's function is defined as hearing and determining claims "on behalf of any Indian tribe, band, or other identifiable group of American Indians" 25 U.S.C.A. § 70a. This function is basically to identify the injured tribal entity, making plain the time of the wrong and the injured group. *Cherokee Freedmen v. United States*, 195 Ct.Cl. 39, 52. "[T]he ancestral group 'owns' the claim, and present-day Indian groups are before the Commission only on behalf of the ancestral entity." *Turtle Mountain Band of Chippewa Indians v. United States*, 490 F.2d 935, 954, 203 Ct.Cl. 426 (1974). In view of the Commission's finding and the procedural scheme we must read the reference to the "plaintiffs" in the Commission's award in Dockets Nos. 72 and 298 as being to them in a representative capacity on behalf of the entire Delaware Nation as compensation for the 1854 wrong.

■ Defendants offer a related argument that the law requires that awards of the Indian Claims Commission be made to existing Indian Tribes and not to individual descendants of the tribe as it existed at the time of the wrong, relying on *Minnesota Chippewa Tribe v. United States*, 315 F.2d 906, 161 Ct.Cl. 258. This purported rule of law is suggested as a rational basis for the statutory exclusion. We must disagree, concluding that the Court of Claims decisions do not support the position of defendant.

Before the Congress defendants pointed to statements in *Minnesota Chippewa Tribe v. United States*, 315 F.2d 906, 913–14, 161 Ct.Cl. 258 (1971)[37]

Tribal lands are communal property in which the individual members have no separate interest which can pass to their descendants who are no longer members of the group. (*Id.* at 913)

At least in such proceedings the Indian Claims Commission Act requires that the awards be made, not to individual descendants of tribal members at the time of the taking, but to the tribal entity or entities today. (*Id.* at 914)

■ The court's opinions since *Minnesota Chippewa* make it clear that the Commission's functions are limited to identifying the injured tribal entity, making plain the time of the wrong and the injured group. See *Cherokee Freedmen v. United States*, 195 Ct.Cl. 39, 52 (1971). The court has stated that the Commission is to leave to the Congress and its agents the decision of the composition of the injured tribe and the designation of those entitled to participate in the judgment. *Id.*

In *Red Lake & Pembina Bands v. Turtle Mountain Band of Chippewa Indians*, 355 F.2d 936, 944, 173 Ct.Cl. 928 (1965), the court discussed the *Minnesota Chippewa* case and others and the Commission's proper function:

The court held that, since the claim was on behalf of the entity, the award must run to the entity, not to individual persons or descendants. This was to make it clear, first, that the claim is a group not an individual demand, and, second, that nothing in the Indian Claims Commission Act bars any current member of the represented group from benefiting or requires the inclusion of descendants who are not now such members. Those questions are left open by the Act. The determinations of 'how the award is to be paid and precisely who can participate in an award' remains for Congressional and administrative determination—the Indian Claims Commission Act standing wholly aside from that extra-judicial resolution. *Peoria Tribe of Indians v. United States,* supra. The form of the

---

**37.** See the Statement of Mr. Rochmes cited n. 28 *supra.*

*award should not pre-determine the persons who will benefit from the award to the group—as it might do if there were binding references to descendants of past members or comparable individualization of the decree.* (emphasis added)

And in *Cherokee Freedmen v. United States,* 195 Ct.Cl. 39 (1971), the court made clear the limitations on the functions of the Commission and the Court of Claims again:

A third separate problem in this family of related topics is the composition of the particular entity or group in whose favor an award is made under the Claims Commission Act— whether specific individuals, classes of persons, or subgroups saying that they are members or components of the prevailing group are entitled to participate in the judgment. Those questions we have consistently held, from the beginning of litigation under the Act, to be beyond the competence of the Commission and this court; they are reserved for Congress or for authorized administrative resolution when the award is paid. (*Id.* at 46)

\* \* \* \* \* \*

*We have always taken pains to assure that any group or person claiming a right to participate (at least colorably) in a judgment under the Act not be totally excluded, either by the form of the award or by the restrictive nature of the entity to which the award goes in name.* Since Congress (or its agent) is to settle disputes as to the composition of, or membership in, the group entitled to the money, the Commission's judgment should not bar an individual or entity from urging before the other branches a right to share on the ground of such membership. (*Id.* at 48) (emphasis added.)

\* \* \* \* \* \*

The third protective device is to make clear—as we do now and as the

Commission should also do in its final decision—the identity of the injured tribal entity. That is well within the authority of court and Commission under the Claims Commission Act (see *McGhee, Yuchi, Red Lake* and *Pembina Bands,* and the other decisions cited supra), and it will be that entity whose composition will be decided by Congress or its designee. (*Id.* at 52)

\* \* \* \* \* \*

The award itself need not say in precise terms that it is for the benefit of the Cherokee Nation "as it existed or was constituted before 1893 (or from 1872–1893)" so long as it is plain that that is the time and the group involved. *The other branches of government can then decide the composition of the Cherokee tribe as of that period.* (*Id.* at 52) (emphasis added.)

See also *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 954, 203 Ct.Cl. 426 (1974).

Hence, we are satisfied that the Commission's authority does not extend to designating the beneficiaries of its awards. This is further reason why we feel the Commission did not intend or make a designation of the Cherokee and Absentee Delawares as the beneficiaries of the award in Dockets Nos. 72 and 298, and that its reference to the "plaintiffs" was merely in the sense of their representative capacity of the injured tribal entity. In this case neither the award nor the decisions of the Court of Claims relied on bears on the question of designation of beneficiaries of the Commission's awards; and they may not serve here as a rational basis for the statutory classifications made by Congress.

*Third,* defendants argue that rationality of the exclusion lies in the fact that the Kansas Delawares gave up any right to share in future Delaware tribal assets by voluntarily electing to sever their tribal membership pursuant to Article IX of the 1866 Treaty with the Delaware Indians, 14 Stat. 793, 796.[38]

There shall be granted to each of the Delawares who have thus become citizens, a patent in fee simple for the lands heretofore

---

**38.** Defendants point to the last sentence of Article IX describing the effect of an election by a Delaware to become a United States citizen:

■ We are not persuaded that any previous waiver or surrender of rights prejudices the Kansas Delawares with respect to this award. Article IX of the 1866 Treaty expressly provided that any Delaware electing to become a citizen would receive patents and his "just proportion, in cash or in bonds, of the cash value of the credits of said tribe, principal and interest, then held in trust by the United States." 14 Stat. at 796. Had the United States fulfilled its obligations in good faith under the 1854 Treaty, the Kansas Delawares on electing citizenship would each have received their just proportion of the increased proceeds of the land sales in 1856 and 1857. The award in Dockets Nos. 72 and 298 was clearly intended to redress the injury and diminution of proceeds from those sales.

■ We find it a strained interpretation of the 1866 Treaty to say that the Kansas Delawares waived any rights to share in such a future award as is involved here. The language of the treaty does not impel such a result and there was no showing that the Indian victims were aware of the wrong done them in the sale of the Delaware lands. "The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people,

who are wards of the nation, and dependent wholly upon its protection and good faith." *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941; see *Antoine v. Washington,* 420 U.S. 194, 200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129; *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615.[39] We cannot accept the waiver argument as a justification for the exclusion.

*Fourth,* it is argued that rationality for the distribution statute may be found in Article 8 of the 1854 Treaty with the Delawares, 10 Stat. 1048, 1050. This provision states that:

> Congress may, at any time, and from time to time, by law, make such rules and regulations in relation to the funds arising from the sale of said lands, and the application thereof for the benefit and improvement of the Delaware people, as may, in the wisdom of that body, seem just and proper.

Defendants argue that this reservation of legislative power by the Congress permits the statutory exclusion of the Kansas Delawares from participation in the award.

■■ Again, construing the treaty as the Indians would have understood it, *Choctaw Nation v. Oklahoma, supra,* 397 U.S. at 631, 90 S.Ct. 1328, the inference that any use made of this reserved pow-

---

allotted to them, and, if they do not remove with the nation, their pro rata share of all annuities and trust property held by the United States for them, the division to be made under the direction of the President of the United States, after which such persons shall cease to be members of the Delaware tribe, and shall not further participate in their councils, nor share in their property or annuities.

Defendants contend that a similar severance of tribal membership and membership rights was made by statute in 1874 (18 Stat. 146, 175) as to Kansas Delawares who were minors in 1866. Plaintiffs disagree, arguing that the statute did not have the effect of severing the minors' membership in the Delaware Tribe. However we feel we need not resolve this question in view of our disagreement with the defendants' basic position that adults' or minors' rights in connection with the award in

Dockets Nos. 72 and 298 were surrendered or waived by the earlier acts of their ancestors or by the intent of the 1874 statute and the 1866 Treaty provisions.

**39.** What has been said also disposes of a related point concerning Article IX of the 1866 Treaty. It is argued that Article IX limited the Kansas Delawares to their just proportion of credits *"then held in trust* by the United States" (emphasis added), and precludes their asserting any rights thereafter to such funds, including the award here. Again, the inference of a waiver or surrender of a right to future redress by the award is untenable. This treaty provision likewise does not impel such an interpretation, and it would violate the cited long-standing canon of construction of Indian treaties. And, as noted, there was no showing of awareness by the Indians of the wrong.

er must be sustained, is unjustified. Article 8 cannot be said to have reserved or conferred power to prejudice Indian rights without regard to constitutional limitations. We have earlier noted that the plenary power of Congress to regulate Indian affairs is subject to constitutional limitations, see *United States v. Klamath Indians,* 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219; see also *United States v. Tillamooks,* 329 U.S. 40, 54, 67 S.Ct. 167, 91 L.Ed. 29; *McCurdy v. Steele,* 353 F.Supp. 629, 637 & n. 12 (D.Utah), rev'd on other grounds, 506 F.2d 653 (10th Cir.). The provisions of Article 8 likewise may not be construed to reserve a power immune from constitutional limitations.

*Fifth,* defendants say that the plenary power of Congress over Indian tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. Defendants contend that the provisions of the later statute—here the distribution enactment—superseded prior treaty provisions and statutes, citing, *inter alia, Choate v. Trapp,* 224 U.S. 665, 670–71, 32 S.Ct. 565, 56 L.Ed. 941; ·*Lone Wolf v. Hitchcock,* 187 U.S. 553, 566, 23 S.Ct. 216, 47 L.Ed. 299; *Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740, and *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244. Defendants argue, contrary to plaintiffs' position, that in light of this unilateral power of Congress to amend or modify treaties and statutes, no "vested rights" were created in favor of the Kansas Delawares by the 1866 Treaty. Defendants conclude that any rights of the Kansas Delawares have been lawfully abrogated by the distribution statute, 25 U.S.C.A. § 1292, under authority recognized in *United States v. Jim,* 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282, and *Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928.

■ We cannot agree with the inferences drawn. The issue is not whether such power is held by the Congress to abrogate treaties or to control distribution of tribal property. Instead, the issue is whether the exercise of power in this area by the distribution statute comports with the safeguards of the Due Process Clause. For we are convinced that the congressional power to abrogate treaties is circumscribed by the limitations in other parts of the Constitution. See *United States v. Klamath Indians,* supra, 304 U.S. at 123, 58 S.Ct. 799; see also *United States v. Tillamooks,* 329 U.S. 40, 54, 67 S.Ct. 167, 91 L.Ed. 29; *McCurdy v. Steele,* 353 F.Supp. 629, 637 & n. 12 (D.Utah), rev'd on other grounds, 506 F.2d 653 (10th Cir.).

■ Moreover, we feel that the dispute between the parties over whether any "vested rights" were conferred on the Kansas Delawares by the treaties need not be resolved to dispose of this argument concerning the power to amend treaties. The plaintiffs' constitutional claim under the Due Process Clause and equal protection principles need not be grounded on a "vested right." See *Shapiro v. Thompson,* 394 U.S. 618, 627 & n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600; see also *Goldberg v. Kelly,* 397 U.S. 254, 262 & n. 8, 90 S.Ct. 1011, 25 L.Ed.2d 287. Regardless of whether the Government was obligated to grant relief for the historic wrong to the Delawares, the relief having been undertaken and the award and appropriation having been made, we feel that the statute drawing classifications is nevertheless subject to due process and equal protection limitations. See *id.; Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891. For even if they have no "vested" or contractual right, the Indian claimants may not be discriminated against by invidious classifications or by classifications having no rational relation to a legitimate legislative goal. See *Weinberger v. Salfi,* 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522.

· Finally, defendants urge that reference to the 1906 and 1940 rolls of the Cherokee and Absentee Delawares, respectively, represents a rational congressional decision to distribute the award to modern day tribal entities and their members, rather than to lineal descendants of the injured tribe as constituted

in 1854. Defendants also contend that reference to the described rolls represents a congressional exercise of recognized power to define tribal membership for purposes of the distribution. See Defendants' Consolidated Proposed Findings of Fact and Conclusions of Law, at pp. 100, 104, 105, 113.[40] We are unable to accept these propositions as a rational justification for the exclusion.

We start from the point that the Indian Claims Commission Act and its underlying policies are neutral, not favoring any particular pattern of distribution of the Commission's awards. See *Cherokee Freedmen v. United States,* 195 Ct.Cl. 39, 46–52 (1971). Nevertheless, it must be remembered that the claim is that of the injured ancestral tribe and present day groups are before the Commission only on behalf of the ancestral entity. *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 954, 203 Ct.Cl. 426 (1974). While in the absence of some provision to the contrary, the right of individual Indians to share in tribal property generally depends on tribal membership, see *Halbert v. United States,* 283 U.S. 753, 762–63, 51 S.Ct. 615, 75 L.Ed. 1389; *United States v. Jim,* 409 U.S. 80, 82, 93 S.Ct. 261, 34 L.Ed.2d 282, we are convinced that distribution of awards under the Act for historic wrongs is not controlled by technical rules of ownership, descent and distribution. Distribution is for congressional disposition, consistent with constitutional limitations applied in light of the purposes of the Indian Claims Commission Act, the treaties and the relief the award affords for injury to the ancestral tribe.

In this instance the claim of the Kansas Delawares to participation in the award has the foundation of the descendancy from the tribe injured at the time of the historic wrong. The wrongful sales of the tribe's lands in 1856 and 1857 diminished the amount of the resulting fund which had been established for the benefit of the Delaware "people" by Article 7 of the 1854 treaty with the tribe, 10 Stat. 1048, 1050, as the treaty repeatedly makes clear. And further, the Kansas Delawares' position is re-enforced by Article IX of the 1866 treaty with the tribe, 14 Stat. 793, 796, recognizing the Kansas Delawares' right, *inter alia,* on electing to take United States citizenship, to their "just proportion" of the tribal credits then held in trust by the United States—credits that would have included the proper measure of payment from sales of the trust lands, but for the wrong to the tribe.

The award in question was made to redress that historic wrong to the entire Delaware Tribe under the 1854 treaty, and the Cherokee and Absentee Delawares were representing "the entire Delaware Tribe in its claim against the United States." See Findings of Fact 1, 23 and 24, Dockets Nos. 72 and 298, 21 Ind. Cl.Comm. 344; opinion in said dockets, 21 Ind.Cl.Comm. at 345, 347. The Kansas Delawares are descendants of the injured ancestral tribe and some 300 of them recently shared in the award under the Act in Docket No. 337 for the similar historic wrong of 1818.

In view of the redress which was the goal of the statute and the award, and in view of the Kansas Delawares' standing being equal in the context of that goal to that of the Absentee and Cherokee Delaware groups benefited, *Jimenez v. Weinberger,* 417 U.S. 628, 637, 94 S.Ct. 2496, 41 L.Ed.2d 363; *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 537, 93 S.Ct. 2821,

---

**40.** In actuality, modern tribal membership of one of the benefited groups, the Absentee Delawares, is not followed in the statutory distribution under 25 U.S.C.A. § 1292(c)(2). *E. g.,* a person born after July 30, 1957, must have ⅛ Delaware blood in order to be recognized as a member of the Absentee Delaware Tribe. See Defendant Absentee Delawares' Ex. 9 and 28.

However, for distribution under § 1292(c)(2) such person need only show that his lineal ancestor's name is on or eligible to be on the constructed base census roll of the Absentees as of 1940, in which case he may thus participate in the distribution though he has less than ⅛ Delaware blood.

37 L.Ed.2d 782, we cannot sustain the unequal classification and the arbitrary exclusion it makes. Against the history, the statutes and the treaties involved, the designation of the two "modern groups" for exclusive distribution of the award is a discrimination reflecting no policy, but simply arbitrary and capricious action. *Baker v. Carr, supra,* 369 U.S. at 226, 82 S.Ct. 691.

We doubt that the Congress actually intended or realized that exclusion of a group such as the Kansas Delawares would result. But in any event, the resulting unequal treatment rests on no foundation rationally related to a legitimate governmental interest serving the purposes of the Act. *Jimenez v. Weinberger,* 417 U.S. 628, 636–38, 94 S.Ct. 2496, 41 L.Ed.2d 363; see *Weinberger v. Salfi,* 422 U.S. 749, 769, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522; *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed.2d 782; *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 172–73, 92 S.Ct. 1400, 31 L.Ed.2d 768; *Richardson v. Belcher,* 404 U.S. 78, 81–84, 92 S.Ct. 254, 30 L.Ed.2d 231.

Giving the statutory classification the presumption of constitutionality as we must, and considering all justifications for the classification, we nevertheless must hold that the resulting exclusion of the Kansas Delawares violates the fundamentals of due process and equal protection.

## IV

## VALIDITY OF THE CHALLENGED INCLUSIONS OF THE CHEROKEE DELAWARES AND THE ABSENTEE DELAWARES IN

## DISTRIBUTION OF THE AWARDS

Plaintiff Kansas Delawares further argue that the Cherokee Delawares are not entitled to participate in the awards in either Docket No. 337 or Dockets Nos. 72 and 298, and that the statutes providing for distribution of both awards, 25 U.S.C.A. §§ 1181–86 and 1291–92, violate their Fifth Amendment rights insofar as they include the Cherokee Delawares in the provisions for distribution of both awards. Plaintiffs also claim that the Absentee Delawares are not entitled to share in the award in Dockets Nos. 72 and 298, relating to the 1854 wrong. They say that the distribution statute for that award, 25 U.S.C.A. §§ 1291–97, violates their Fifth Amendment rights insofar as it includes the Absentee Delawares.[41]

■ We disagree with these positions taken by the Kansas Delawares and conclude that the challenged distribution provisions are valid insofar as they included the Cherokee and Absentee Delawares.[42]

### *The Inclusion of the Cherokee Delawares*

Plaintiffs first claim that the Cherokee Delawares are Cherokee Indians by blood and hence have no right to share in awards to the Delaware Tribe. They argue that the Delawares who removed to the Indian Territory as contemplated by the Treaty of 1866, 14 Stat. 793, (*i. e.,* the "registered Delawares") became incorporated into the Cherokee Nation under the 1867 Articles of Agreement between the Cherokees and Delawares (Pl. Ex. 10, Tab I).[43] The Kansas Delawares

**41.** Plaintiffs do not challenge the right of the Absentee Delawares to share in the award in Docket No. 337, redressing the breach of the 1818 Treaty. See Plaintiffs' Proposed Finding of Fact No. 31; Brief of Plaintiff in Support of Motion for Summary Judgment at 80; Plaintiffs' Reply Brief on Constitutional Issues at 2.

**42.** We realize that as a result of our conclusion in Part III that the classifications made are invalid, and our conclusion in Part V that we must hold 25 U.S.C.A. §§ 1291–97 invalid as a whole, our consideration of plaintiffs' ad-

ditional challenges to the statute may be viewed as unnecessary. However, because of the desirability of a prompt decision on all of these constitutional issues, and of economy in efforts, we feel we should decide all these claims on their merits.

**43.** The Agreement between the Delawares and the Cherokees provided in part as follows:

On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe, registered as above provided, shall become members of the Cherokee Nation,

contend that the effect of the 1867 Agreement was to abolish the Delaware Tribe as a political entity, with the registered Delawares individually becoming citizens of the Cherokee Nation and the children of these registered Delawares thereafter born becoming native blood Cherokees, citing *Cherokee Nation v. Journeycake,* 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120, and *Delaware Indians v. Cherokee Nation,* 193 U.S. 127, 24 S.Ct. 342, 48 L.Ed. 646, *inter alia.*

Plaintiffs conclude that the Cherokee Delaware class, being composed of present living descendants of children of registered Delawares born after the 1867 agreement, is not a class of persons who are descendants of members of the Delaware Nation as it existed in 1818 or 1854, in terms of Indian tribal ancestry, citing *Halbert v. United States,* 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389. They argue that the Cherokee Delawares are native blood Cherokee citizens who never acquired any interest in the Delaware tribal claims for the 1818 or 1854 wrongs, and that they are not entitled under any constitutionally permissible rationale, to participate in the awards for either the 1818 or 1854 wrongs to the Delaware Tribe. They challenge the provisions for distribution of the awards to the Cherokee Delawares as invidious discrimination against those entitled to share in the awards, and claim deprivation of property without just compensation in violation of the Fifth Amendment.

■ We cannot agree that constitutional limitations prohibit distribution of an Indian Claims Commission award to all lineal descendants of the injured tribe. As stated, the claim to redress under the Act is that of the ancestral tribe and present day groups are before the Commission only on behalf of the ancestral entity. *Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 954, 203 Ct.Cl. 426 (1974). The function of Congress is to decide the composition of the injured tribe at the time of the wrong. *Cherokee Freedmen v. United States,* 195 Ct.Cl. 39, 52 (1971). We are convinced that a legislative decision to distribute an award to the lineal descendants of the injured tribe at the time of the wrong, regardless of their current tribal membership status, is well supported, considering the redress which is the goal of the Indian Claims Commission Act.

■ One ground for plaintiffs' argument is that the award should be treated as tribal property and governed by principles of communal ownership, applied in light of tribal history subsequent to the wrong.[44] We have already concluded that distribution of awards under the Act, which is for congressional decision, is not controlled by technical property concepts. We are satisfied that the Congress has sound ground for deciding to distribute an award to lineal descendants of the tribe injured by the wrong. See *Cherokee Freedmen v. United States,* 195 Ct.Cl. 39, 46–52. And as discussed in Part V, *infra,* we conclude that there are no "vested rights" related to the awards in question which must be observed in the distribution.

---

with the same rights and immunities, and the same participation (and no other) in the national funds, as Native Cherokees, save as hereinbefore provided. And the children hereafter born of such Delawares so incorporated into the Cherokee Nation, shall in all respects be regarded as native Cherokees.

44. Essentially, plaintiffs' argument is this: The move to the Cherokee Nation did not abolish the Delaware national fund (which was diminished as recognized by the awards in Docket No. 337 and Nos. 72 and 298). After the 1867 move, the registered Delawares in Oklahoma and the Kansas Delawares were owners of the national fund, and, since this ownership was communal in nature, it could not be devised, transferred or inherited. On the death of the registered Delawares, their ownership interest terminated. The children of the registered Delawares, not being of Delaware blood, but of Cherokee blood, did not inherit from their Delaware Indian parents any interest in the Delaware national fund or in any claims which the prior existing Delaware tribe owned for breaches of treaties by the United States. The succeeding generations of descendants of the registered Delawares are also Cherokees, since they must claim through parents who were native Cherokees, the rule being that children belong to the tribe of their parents, not of their

Plaintiff Kansas Delawares argue further that all Cherokee Delawares who, pursuant to 25 U.S.C.A. §§ 991–98, participated in the award in Indian Claims Commission Docket No. 173 of some $14,000,000 to the Cherokee Tribe, are barred by 25 C.F.R. § 101.4 from participating in the awards in question here. The regulation provides in pertinent part that:

> An Indian holding equal rights in two or more tribes can share in payments to only one of them and will be required to elect with which tribe he wishes to be enrolled and to relinquish in writing his claims to payments to the other.

More broadly, plaintiffs maintain that this rule against dual eligibility for tribal benefits is a long standing public policy. See *Mandler v. United States,* 52 F.2d 713, 714 (10th Cir.); F. Cohen, Handbook of Federal Indian Law, 137 (orig. ed. 1942). In view of these principles the Kansas Delawares assert there is no rational basis for the congressional decision permitting the Cherokee Delawares to share in the award to redress the Delaware wrongs of 1818 and 1854.

We must disagree. By its own terms 25 C.F.R. § 101.4 applies in circumstances where an Indian holds equal rights in two or more tribes and prevents sharing in payments made to two tribes. Even if controlling over the distribution statutes, the policy and regula-

tion may be viewed as inapplicable on the theory that Indians, like the Cherokee Delawares, participating in the awards here are not receiving payments of two tribes, but that the participation in these awards brings compensation based on earlier circumstances when their ancestors were members of another injured tribe—or at least the Congress could rationally so conclude.

But in any event the policy and the regulation may be changed by statute, subject to constitutional limitations which we feel do apply to an exercise of congressional power over Indian legislation. We see no violation of constitutional limitations arising from a change in policy concerning sharing in two tribal benefits.

### *The Inclusion of the Absentee Delawares*

The plaintiff Kansas Delawares further argue that the Absentee Delawares may not be validly included in distribution of the award in Dockets Nos. 72 and 298 redressing the 1854 wrong. They say that the Absentees' ancestors were not with the main body of the Delaware tribe at the time of the 1854 wrong and were not harmed by breach of the 1854 Treaty.[45] Essentially they contend that entitlement to the benefit of a treaty or to compensation for its breach depends on residency with the tribal entity at the time of entering into the treaty and at

---

grandparents. *Halbert v. United States,* 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931). Plaintiffs conclude that the Cherokee Delawares, as Cherokees, have not succeeded to any rights of the prior existing Delaware tribe, and may not share in the national fund or in the claims which have matured into the awards in Docket No. 337 or Dockets Nos. 72 and 298.

We have rejected similar arguments that the distribution of awards, which is for congressional decision, is controlled by technical property concepts. Likewise, such contentions on the legal status of Cherokee Delawares and their rights under laws of descent are not dispositive of the constitutional claims. In any event, we are satisfied that despite the policy arguments against the Cherokee Delawares sharing in both Cherokee and Delaware

awards, there was a sufficient nexus between the Cherokee Delawares and the injured ancestral tribe by descendancy for Congress rationally to include the Cherokee Delawares in the distribution of the awards redressing the 1818 and 1854 wrongs.

**45.** Although plaintiffs do not concede that the Absentee Delawares were members of the scattered Delaware Nation in 1854, they contend that even if they were, they were not in Kansas with the main body of the tribe which made the 1854 Treaty and were not residing on the lands which were ceded by the treaty. It is further claimed that those Absentees who did rejoin the main body of the tribe in Kansas prior to 1854 are ancestors of present members of either the Cherokee Delaware class or the Kansas Delaware class.

the time of the wrong, respectively, and on being subject to the obligations of tribal membership, citing *Eastern Band of Cherokee Indians v. United States,* 117 U.S. 288, 6 S.Ct. 718, 29 L.Ed. 880; *McGhee v. Creek Nation,* 122 Ct.Cl. 380, cert. denied, *U. S. v. McGhee,* 344 U.S. 856, 73 S.Ct. 91, 97 L.Ed. 665; *Prairie Band of Potawatomi Indians v. United States,* 165 F.Supp. 139, 143 Ct.Cl. 131 (1958), and *Miami Tribe of Oklahoma v. United States,* 281 F.2d 202, 150 Ct.Cl. 725 (1960). And the Kansas Delawares conclude that the unjustified inclusion of the Absentees in distribution of the award dilutes the interest of those rightfully entitled to such funds and constitutes a taking of their property without just compensation.

 We are unpersuaded by the arguments. It is true that Indians who sever their tribal relationship and separate from the tribe lose their right to participate in tribal assets. *Miami Tribe of Oklahoma v. United States,* 281 F.2d 202, 213, 150 Ct.Cl. 725 (1960). However, an Indian group absent from a main tribal body at the time of a wrong may still be recognized by the tribe as retaining tribal membership, and may have a claim to participate in an award redressing a wrong to the tribe. *Delaware Tribe of Indians v. United States,* 128

F.Supp. 391, 399, 130 Ct.Cl. 782 (1955). Hence it is relevant to consider what the policy of the Delaware Tribe was in 1854 with respect to recognizing a continued relationship with the Absentees.

We feel the historical materials before us are not conclusive as to whether the Absentees were considered by the tribe to have retained their membership at the time of the breach of the 1854 Treaty. The Kansas Delawares rely on historical documents allegedly showing that, as a result of absenting themselves from the main tribal body in Kansas, the Absentees had, by tribal law, ceased to participate in the tribal councils and to have any interest in tribal property.[46] Defendants, on the other hand, point to several treaty provisions and authoritative discussions of Delaware history indicating that the Absentees were recognized as members of the tribe by its main body in 1854. See Article IV of the 1860 Treaty between the United States and the Delaware Tribe, 12 Stat. 1129, 1130–31; S.Rep.No.1518, 90th Cong., 2d Sess. 7–11 (1968).[47] Moreover, we note that the Court of Claims found from its examination of the tribal history that "the rule and policy of the Delawares [in 1854] was and had been to recognize all Delawares everywhere, who had maintained their identity as Dela-

**46.** Plaintiffs cite Pl.Ex. 32 (Letter from John G. Pratt, U.S. Indian Agent, to Thomas Murphy, Supt. of Indian Affairs, July 14, 1868) in support of this proposition. They further allege that the Absentees received no portion of the annuities paid to the main body of the tribe and did not participate in any of the treaty benefits accruing to the main body of the tribe, citing Pl.Ex. 32, *supra*; Pl.Ex. 145–B (Letter from John G. Pratt to Thomas Murphy, Nov. 27, 1866); Pl.Ex. 64 (Letter from A. H. McKisick, Wichita Agent, to Elias Rector, Supt. of Indian Affairs, Oct. 21, 1857, excerpt from Report of the Comm'r of Indian Affairs, 1857); Pl.Ex. 149 (Excerpt from "Registry, Allotment, Valuation, etc., Delaware Diminished Reserve, Treaty, July 4, 1866"). In particular, they argue that the Delaware national fund, into which the proceeds from the sale of the lands under the 1854 Treaty were placed, was paid out per capita to members of the Delaware nation by 1893 and that the Absentees never received any part of such fund.

There was an objection as to authentication of plaintiffs' exhibit 32, cited above, which appears to be good. Nevertheless, even considering the exhibit, our conclusion remains the same in rejecting plaintiffs' arguments in view of the treaty provisions and other documents cited which serve as an adequate and rational basis for the decision of Congress to include the Absentees in the distribution of the award.

**47.** The defendants say the Treaty of May 30, 1860 between the United States and the Delaware Tribe, 12 Stat. 1129, is evidence of such a contemporaneous understanding as to the structure of the Delaware tribe. Article I of that treaty referred back to Article 11 of the 1854 Treaty, 10 Stat. 1048, 1050, which had provided for the possible future survey and individual assignment of the residence lands left to the Delawares under the 1854 Treaty. Article I went on to provide that those lands should now be surveyed "and to each member

wares, as members of the tribe." *Delaware Tribe of Indians v. United States, supra,* 128 F.Supp. at 399.

 We feel this view is persuasive, and that the Congress also was entitled to consider it in drawing the distribution statutes, along with the other historical evidence. Thus, although the historical materials are not conclusive, there is support for the position that the Delaware tribe in 1854 recognized the Absentees as members of the tribe. In these circumstances we cannot say the Congress had no rational basis for the inclusion of the Absentees in the provisions for distribution for the award to redress the 1854 wrong.

## V

### EQUITABLE JURISDICTION AND REMEDIES

Having concluded that the classifications made in 25 U.S.C.A. §§ 1291–97 for distribution of the award redressing the 1854 wrong, resulting in the exclusion of the Kansas Delawares, are invalid, it remains to consider the proper remedies and to determine whether other portions of the distribution statute may be upheld

and continued in effect. These questions lead us to the remaining disputes between the parties.

First, defendants argue that if plaintiffs' allegations of a taking of their property without just compensation and without due process are true, they may be entitled to recover money from the Treasury and must present their complaint in such a suit in the Court of Claims or in the district courts. They point to 28 U.S.C.A. § 1505 conferring jurisdiction on the Court of Claims to hear Indian claims against the United States; to the Tucker Act, 28 U.S.C.A. § 1491, granting that court jurisdiction of claims against the United States founded on the Constitution, among other things; and to jurisdiction conferred on the district courts by 28 U.S.C.A. § 1346 to hear such claims for amounts not exceeding $10,000. Defendants argue that the only constitutional question presented is whether the challenged statutes have deprived plaintiffs of their resort to those forums; that there is no such foreclosure of remedies to recover by actions at law there; and that injunctive relief and invalidation of the statute would therefore be improper, citing *Regional Rail Reorganization Act Cases,*

---

of the Delaware tribe there shall be assigned a tract of land containing eighty acres . . ." Article IV of the 1860 Treaty, 12 Stat. 1129, 1130–31, went on to make provision for the Absentee Delawares in the following terms:

Whereas some years ago a good many of the Delawares went down among the Southern Indians, and as there are still about two hundred of them there, and as they have reason to believe they will return soon, it is hereby agreed that eighty acres each be set apart for them, to be allotted to them as they return, and certificates to be then issued to them, in the same manner as to those now within the reservation, and in every respect to be governed by the same rules and regulations as prescribed for the government of the lands reserved by the preceding articles, that until they return the allotments set apart for belong (sic) to the nation in common.

Defendants contend that, by this 1860 Treaty, the ancestors of the Absentee Delaware class were recognized as members of the Delaware Tribe with rights co-extensive with all other tribal members. They allege that these rights

included full rights to tribal land, annuities, trust funds and interest accruing to the Delawares under former treaties, including the 1854 Treaty.

However, plaintiffs assert that Article IV of the 1860 Treaty was not an offer to allow the Absentees to share in the *Delaware national fund* if they returned, but only an offer of an *eighty acre allotment* to each Absentee if they returned. In any event, plaintiffs urge that the Absentees did not, in fact, return in response to the opportunity offered by the treaty, thus refusing to rejoin the tribe and forfeiting their right to receive land in Kansas. Plaintiffs cite Pl.Exs. 32 and 145–B in support of this contention. Further, plaintiffs argue that the 1860 Treaty is irrelevant because under the controlling cases, merely being recognized as a part of the tribe or Nation is not sufficient grounds to establish the Absentees' claim to share in proceeds relating to the breach of the 1854 Treaty, citing *Prairie Band of Potawatomi Indians v. United States, supra,* 165 F.Supp. 139, 143 Ct.Cl. 131, and *Miami Tribe of Oklahoma v. United States, supra,* 281 F.2d 202, 150 Ct.Cl. 725.

419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320; *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; and *Hurley v. Kincaid,* 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637. See Defendants' Consolidated Proposed Findings of Fact and Conclusions of Law, at pp. 71–75.[48]

We feel that reliance on *Regional Rail Reorganization Act Cases, supra,* is misplaced. The case involved admittedly existing property rights of the rail companies, their owners and claimants against the bankrupt estates. The Court defined the major issues as being whether an action at law under the Tucker Act will be available to recover any deficiency of constitutional dimension in compensation for the takings allegedly to be affected by the Act, and if the Tucker Act remedy is available, whether it is adequate. 419 U.S. at 121, 95 S.Ct. 335. The Court held that the Tucker Act remedies were not withdrawn, and that they were adequate to recover compensation for any "constitutional shortfall" resulting from conveyances required and, therefore, that the *Regional Rail Reorganization Act* was not an unconstitutional reorganization plan. *Id.* at 154–55, 95 S.Ct. 335.

However, the case involved no question of the existence of obvious property rights or vested rights of the various parties, *id.* at 122, 137, 95 S.Ct. 335, and the Tucker Act remedy was held available for monetary recovery for any inadequacy in compensation under the Act's reorganization procedures. On the contrary, we feel that here the plaintiffs have no property or vested right in the Indian Claims Commission award in question and, hence, no remedy to recov-

er specific monetary compensation on behalf of any plaintiff or the class of Kansas Delawares. As explained earlier, while we uphold the plaintiffs' claim under the Due Process Clause and equal protection principles incorporated by it, that constitutional claim grounded on irrational classifications is available without the premise of property or vested rights in the award.[49] We do not feel that plaintiffs have any such property or vested rights in the award as may premise a constitutional claim entitling them to specific monetary recovery under the Tucker Act. As pointed out below, after the award is entered Congress subsequently determines the beneficiaries of the award and there may not be a constitutional claim for monetary recovery with respect to the award as entered. Cf. *United States v. Jim,* 409 U.S. 80, 83, 93 S.Ct. 261, 34 L.Ed.2d 282.

For like reasons *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, and *Hurley v. Kincaid,* 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 are not in point, since they also involved admittedly existing property rights whose taking was compensable by recoveries against the United States.

Since we conclude that the plaintiffs here have no property or vested rights in the award, we feel that they have no remedy at law for specific monetary recovery under the Tucker Act, although they do have a good claim for protection against the irrational statutory classification and exclusion. We are persuaded we should consider and uphold that constitutional claim on its merits and grant equitable and declaratory relief, there being no full and adequate remedy at

---

**48.** Defendants argue that plaintiffs could maintain a class action in the Court of Claims under procedures analogous to those under Rule 23 F.R.Civ.P. See *Quinault Allottee Association v. United States,* 453 F.2d 1272, 197 Ct.Cl. 134. Thus they say no multiplicity of suits and no other like inequitable result would occur by litigation in that forum, or in a district court suit under 28 U.S.C.A. § 1346.

**49.** Defendants argue that the Court of Claims does give plenary consideration to claims of

arbitrary and invidious discrimination, relying on *Fredrick v. United States,* 507 F.2d 1264, 1266 (Ct.Cl.), saying that all claims of plaintiffs must be put before the Court of Claims. Again, however, the *Fredrick* case involved a claim of a statutory right to employment and monetary recovery which distinguishes it from our case where no such rights in the award exist.

law and no reason to avoid a prompt decision. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153; see *Aircraft & Diesel Corp. v. Hirsch,* 331 U.S. 752, 780, 67 S.Ct. 1493, 91 L.Ed. 1796.

■ Our conclusion that the plaintiffs here have no vested or property rights in the award, as they claim, is based on the special procedures of the Indian Claims Commission, discussed earlier. Under those procedures the Commission's awards determine only the identification of the injured tribal entity, making plain the time of the wrong and the injured group, and do not pre-determine the persons who will share the award; later the Congress determines the composition of the injured tribal entity and the beneficiaries of the award. See *Cherokee Freedman v. United States,* 195 Ct.Cl. 39, 48, 51–52. In addition, the Congress decides on procedures for the subsequent distribution and whether portions of the fund should be held in trust for the Indians' benefit. *E.g.,* 25 U.S.C.A. §§ 1293 and 1294. In light of these undecided points remaining for congressional decision after entry of the Commission's awards, it seems clear that no individual or class property right attaches or vests in the Commission's award as entered, such rights depending on later congressional determination.

Finally, we must determine the proper disposition to make in view of our conclusions concerning the validity of the distribution statutes. Of course, since the Act distributing the award redressing the 1818 wrong is being upheld, the interlocutory restraint affecting the remaining portion of that award should be vacated, and we will grant a declaratory judgment of the validity of 25 U.S.C.A. §§ 1181–86 and deny all other relief sought in connection with the award in Docket No. 337 which that statute distributes.

We have concluded that the statute distributing the award redressing the 1854 wrong, 25 U.S.C.A. §§ 1291–97, contains irrational classifications, resulting in an invalid underinclusion. *Jimenez v. Weinberger,* 417 U.S. 628, 637, 94 S.Ct. 2496, 41 L.Ed.2d 363. In such circumstances there are two general alternatives: the court may declare the statute invalid as a whole, or it may extend its coverage to include those aggrieved by the exclusion. See *Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 26 L.Ed.2d 308 (Harlan, J., concurring); *Moritz v. Commissioner of Internal Revenue,* 469 F.2d 466, 470 (10th Cir.), cert. denied, 412 U.S. 906, 93 S.Ct. 2291, 36 L.Ed.2d 971. While in some cases involving a deeply imbedded policy there are compelling reasons to make the "necessary statutory repairs," *Welsh v. United States, supra,* 398 U.S. at 366, 90 S.Ct. 1792, extending the coverage of the statute and saving its validity, we feel that we may not do so here.

■ There is no separability clause in the statute. The absence of such a clause may not foreclose the exercise of discretion to the end that the legislative provisions may be repaired and saved. *Id.* at 366, 90 S.Ct. 1792. Here the difficulty with repair is that the remainder of the statute does not contain general provisions easily adaptable to an extension of the statute's coverage. See *Moritz v. Commissioner of Internal Revenue, supra,* 469 F.2d at 470. Moreover, even if repairs by an extension of coverage were possible, we cannot confidently say that Congress would have intended the continued operation of the remaining parts of the statute—such as the provision for withholding 10 percent of the awards in trust—if it had known that the statute would have to be subjected to an extension of its distributive provisions to include the Kansas Delawares.

In view of these difficulties and the absence of a separability clause, we conclude we should follow the general presumption that is observed where a separability clause is not provided, and hold the statute invalid as a whole. See *Carter v. Carter Coal Co.,* 298 U.S. 238, 312, 56 S.Ct. 855, 80 L.Ed. 1160. This disposition will permit further congressional

consideration of a desired distribution enactment as a whole, free of the invalid exclusion.

In sum, we conclude that we should adjudge the statute distributing the award redressing the 1818 wrong, 25 U.S.C.A. §§ 1181–86, valid in all respects. The preliminary restraint against distribution of the remainder of that award will be vacated, and all relief sought by the plaintiffs with respect to that award will be denied. With respect to the statute distributing the award redressing the 1854 wrong, 25 U.S.C.A. §§ 1291–97, we are entering our decree declaring that the provisions ·including the Cherokee Delawares and the Absentee Delawares in the distributive scheme are valid, but that the classifications drawn and the resulting exclusion of the Kansas Delawares render this distribution statute invalid as a whole, and we restrain distribution by the Secretary under that statute.

We find and conclude that there is a case of actual controversy within the jurisdiction of the court, appropriate for entry of a declaratory judgment determining the rights and legal relations of the parties and classes involved. The funds appropriated to satisfy the award in Indian Claims Commission Dockets Nos. 72 and 298, and the increments of interest thereon, are under the control of the Defendant Secretary and his agents and employees, and are required to be distributed and credited pursuant to the distribution statute which we hold invalid. Unless equitable relief is granted, such distribution and crediting will occur and irreparable harm to the plaintiffs and the plaintiff Kansas Delaware class will result. Therefore declaratory and equitable relief should be granted in connection with said award, as provided in our judgment.

Since our earlier orders were entered denying motions, and the filing of answers to the complaints, several additional motions have been filed by the parties for additional relief. We conclude that these motions should all be denied for lack of merit or because our conclusions and our decree render all necessary and proper relief.

## APPENDIX

### A

In the transcript of the hearing before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, the following remarks appear between Mr. Pruner, a member of the Tribal Council for the Absentee Delaware Tribe; Congressman Edmondson of the Subcommittee, who presided; and Mr. Townsend of the Delaware Business Committee for the Cherokee Delawares, (House Subcomm. Hearings *supra* n. 27, at 78–80):

Mr. Pruner. To clarify that one point further, Myrtle Holder and Exendine are members of our tribe—

Mr. Edmondson. They did not sue in that capacity, they sued in the capacity as class litigants for the Delaware Nation.

Mr. Pruner. Yes.

Mr. Edmondson. I can understand Counsel's reason for having drafted it that way, because he wanted a provision that would cover the waterfront. And he got it covered with the judgment. *Of course we have the task of defining just who the Delaware Nation in 1854 included, .in addition to what you have before us here today as Plaintiffs representing the two Oklahoma groups.* And I for one am certainly ready and willing to exclude anybody who is a member of the Delaware Nation of 1854 who went elsewhere and participated in a judgment as a member of another tribe. *But I have some difficulty about a person who is a descendant of that Delaware Nation of 1854 who went elsewhere and has not affiliated with another tribe and participated in a judgment from another tribe.* It poses a problem for me as a very biased Oklahoman on the subject. And I think you will probably have more trouble with non-Oklahomans than you do with Oklahomans.

Mr. Rochmes. *Mr. Chairman, we do not think there are any such. We know the Bureau maintains there are. We think that all those people either are on those rolls or are eligible for the rolls at the very times at which the rolls were made.*

Mr. Edmondson. If you do not think there are any you would have no objection to our including as an eligible person who can prove he is a lineal descendant of someone who was a member of the Delaware Nation in 1854, and who had not participated in any other tribal judgment?

Mr. Rochmes. I think you would have to draft tougher standards than that, because the Bureau people have already made it known to us that they intend to include people who we think clearly are not Delawares and were not part of the Delaware Nation as of that time.

Mr. Edmondson. Then they would have to prove that they are descendants of Delawares.

Mr. Rochmes. Yes. But the Bureau is already saved [sic] with the proof, as for example, that the Christian Munsees were Delawares as of this time. And we think the evidence which saves [sic] them would not save [sic] a court and would not save [sic] you, perhaps. (emphasis added)

### B

Defendants point to several statements in the legislative history which they rely on as showing that Congress was aware that it might be eliminating some lineal descendants of the 1854 Delaware Nation in enacting the narrower provisions of 25 U.S.C.A. § 1292. The first is contained in the Statement of Louis L. Rochmes, tribal attorney for the Cherokee Delawares group, (attached to the House Subcomm. Hearings, *supra* n. 27 at 45 ff).

That Statement reads, in part, as follows:

This statement is submitted in support of the [Cherokee and Absentee Delaware] tribes' position on H.R. 5200.

In substance that position is that the bill should provide for the division of the funds between the two tribes, to the exclusion of non-Delawares.

Discretion to effect another division has been requested by the Bureau of Indian Affairs . . . The Bureau proposes to conduct a search among the Stockbridge-Munsee Community of Wisconsin for those descendants of the "Emigrant New York Indians" who, it is asserted, "were Delawares who had previously absented themselves from the main body of the tribe" *and also to search for others who, it is hypothesized, "may also be descendants of members of the Delaware Nation in 1854".* These are suppositions not based on fact. I was associated with counsel for the plaintiffs in the Emigrant New York Indian case, and am familiar with the evidence adduced in that case. . . . There was no evidence of Delawares among the Emigrant New York Indians. . . .

Even if these suppositions were based on fact, they would not justify the Bureau's position. The Indian Claims Commission Act is intended expressly for the benefit of existing Indian tribes, bands and other identifiable groups, and a search for individual descendants who may have elected to change their tribal affiliation is unwarranted. . . .

\*　　\*　　\*　　\*　　\*　　\*

*The Delaware tribes are particularly concerned with an opinion expressed by Bureau representatives. . . . This is the opinion that a group of Munsee Indians living in Kansas, sometimes known as the Christian Indians, sometimes as the Christian Munsees, and more recently as the Chippewa Munsees, are entitled to be regarded as Delaware for the purpose of sharing in Delaware judgment funds, and particularly in Dockets 72 and 298.* (emphasis added)

Defendants point to the mention of "others" who may also be descendants of members of the Delaware Nation in 1854. However, Mr. Rochmes states

thereafter that the supposition that there are any "other" such descendants "is not based on fact." The statement as a whole focuses on the question of the possible inclusion of various Munsee Indians in Dockets Nos. 72 and 298, while making no reference to the Kansas Delawares or any group of lineal descendants of true members of the Delaware Nation in 1854 who might be excluded from the judgment by deletion of the "lineal descendants" provision. Mr. Rochmes testified later before the House Subcommittee on Indian Affairs, to which this statement was made, that all true descendants of the Delaware Nation of 1854 who had not affiliated with another tribe or participated in a judgment to another tribe would be covered by the distribution provision proposed by the Cherokee and Absentee Delawares. See Part A of this Appendix.

A second statement to which defendants refer is contained in a letter from Nathaniel P. Reed, Assistant Secretary of the Interior, to Caspar W. Weinberger, Director, Office of Management and Budget, dated September 28, 1972, which states the views of the Department of the Interior on H.R. 14267. That letter discusses the differences between H.R. 14267 and H.R. 5200 and, in regard to H.R. 14267's reliance solely upon the 1906 and 1940 rolls, states: "Although, unfortunately, they [the two rolls] do not include a few Delaware descendants who do not reside in Oklahoma, we consider them to be acceptable rolls." We note however, that this letter was written after H.R. 14267 had passed both houses of Congress to give the Department of the Interior's recommendation as to whether the President should approve the bill.

Third, defendants point to a report written by the Department of the Interior which was included in the House Report accompanying H.R. 16402 (the bill for distribution of the award in Docket No. 337), wherein the Department stated (H.R.Rep.No.1555, 92d Cong., 2d Sess. 3–4 (1968) (Defendants Secretary and Cherokee Delawares' Ex. 3)):

There are also other individuals who are lineal descendants of members of the Delaware Nation as it was constituted in 1818, but who are not presently affiliated with either of the Oklahoma Delaware groups. Some we believe, are affiliated with the Stockbridge-Munsee Community in Wisconsin and *others are not affiliated with any tribal group under federal supervision.* In view of the amalgamation of the Delawares with other Indians and the many unique and complex problems encountered in identifying the ultimate beneficiaries of this award, a brief history of the Delaware Nation is enclosed. (emphasis added)

We cannot agree that this earlier, 1968 Departmental reference to "others" (i. e., other lineal descendants not affiliated with any tribal group) served as any notice to Congress of the existence of the Kansas Delawares, especially in view of the fact that the history the Department attached to its report dealt extensively with Munsee affiliations.

In its history the Department stated (*Id.* at 10):

The *majority* of Delaware Indians who moved on to the Kansas reserve remained until 1867. By the terms of an April 8, 1867, agreement concluded between these Delawares in Kansas and the Cherokee in Oklahoma, the Delaware removed to Indian territory and reside today as Cherokee Delaware in northeastern Oklahoma. (emphasis added)

From this and other exhibits defendants request a finding that:

Congress was aware, from 1968 forward, that the appropriation and distribution legislation which it enacted to pay the Final Awards of the Indian Claims Commission in *both* Indian Claims Commission Docket No. 337 and Indian Claims Commission Dockets Nos. 72 and 298, would not provide payment to every person who could claim to be, ethnologically, a 'Delaware'. The Department of Interior's Report to Congress, a part of the legislative history of House Report No.

1555, 90th Congress, 2d Sess., the Report which accompanied H.R. 16402, the Bill which eventually became Public Law 90–508 (25 U.S.C. 1181–86) (Sec. of Int. and D.T.I. No. 3) reflects that the Bill would provide for payment to the 'majority' of modern-day Delaware Indians.

Defendants' Proposed Findings of Fact and Conclusions of Law, p. 63 (as amended Oct. 3, 1975).[1]

We are not persuaded that the 1968 or 1972 legislative history, or both combined, support such an inference or indicate any awareness that the 1972 statute (25 U.S.C.A. §§ 1291–97) would exclude a group such as the Kansas Delawares who were lineal descendants of the 1854 Delaware tribe.

Defendants also cite the House Committee Report accompanying H.R. 14267 (the bill for distribution of the award in Dockets Nos. 72 and 298) and emphasize the statement therein that (H.R.Rep.No. 92–1081, 92d Cong., 2d Sess. 2 (1972) (Defendants Secretary and Cherokee Delawares' Ex. 6)):

> The recommendations of the Department [of the Interior] regarding the preparation of the updated roll [of those who had participated in the Docket No. 337 judgment] were not adopted by the committee because they were strenuously opposed by both of the Indian groups concerned, and *the Indian position is, in the opinion of the committee, a defensible one.* (emphasis added)

However, as stated above, it does not appear that the House Committee was aware that the "Indian position" it termed defensible would result in the exclusion of lineal descendants of persons who were members of the Delaware Tribe in Kansas in 1854.

Finally, defendants have pointed to the following colloquy between Senator Bellmon and Mr. John O. Crow, then Acting Commissioner of the Bureau of Indian Affairs, which occurred during the course of the Senate subcommittee hearings on distribution legislation for the award in Dockets Nos. 72 and 298, at which Senator Bellmon presided:

> Senator Bellmon. As you know, I am from Oklahoma and I am aware that both Delaware groups oppose S. 1067, but favor H.R. 14267, which was approved by the House. Can you give me your reasoning for favoring S. 1067 or H.R. 14267?
>
> \* \* \* \* \* \*
>
> Senator Bellmon. Do you know the basis for the objections to S. 1067?
>
> Mr. Crow. I think the tribal delegates can tell you much better than I. However, I think that the primary difference, perhaps, is in the definition of persons excluded from sharing in the judgment.
>
> Senator Bellmon. Do you have any information as to how many would be excluded under H.R. 14267 that would have been included in S. 1067?
>
> Mr. Crow. *It is most difficult to say. We think the number would be quite small. We can't see any possibility of it being more than 200 people.*[50]

Hearings on S. 3113, S. 1067, S. 2249 and S. 2298 Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess. 38–39 (July 21, 1972) (Pl.Ex. 5). Defendants assert that this colloquy demonstrates that both the Senate and the House were aware that the distribution statute would not include all possible Delaware claimants.

We note Senator Bellmon's question to Mr. Crow further in the same hearing. *Id.* at 40.

> Senator Bellmon. If the Congress were to take action which excluded the *non-Oklahoma Delawares* from sharing in this judgment, do you see any possible future legal implications

---

50. It will be recalled that S. 1067 would have updated the Docket No. 337 roll to include lineal descendants of the Delaware Nation as it existed in 1854. H.R. 14267 was essentially the bill enacted.

for the federal government? (emphasis added)

Mr. Crow. Mr. Chairman, I don't.

Subsequent testimony by tribal delegates in the same hearing makes it clear that the impression was that the persons that would have been included by S. 1067 (to which Mr. Crow made reference, *supra*) and the "non-Oklahoma Delawares" that were being considered for exclusion (to which Senator Bellmon made reference, *supra*) were the Munsee Indians:

Mr. Townsend. Mr. Chairman, I am Bruce Miller Townsend, Chairman of the Delaware Tribal Business Committee. To my right is Mr. Lawrence Snake who is President of the Absentee Delaware Tribe of Western Oklahoma. . . .

\* \* \* \* \* \*

When S. 1067 was first introduced into the Senate of the United States, there were problems at that time that were latent and did not come to the fore until a later time. They didn't take very long. *Id.* at 42.

\* \* \* \* \* \*

The crux of the matter is the difference between the departmental report, as Mr. Crow has stated, his inclusion of a foreign group of Indians in Delaware matters, that is the Munsee Tribe, and the various names by which it goes. *Id.* at 44.

\* \* \* \* \* \*

Senator Bellmon. . . .

Only one further question. This is the tough one, I am sure, for all of you. But if Congress moves ahead to approve legislation along the lines of the House-passed bill, which would exclude *the non-Oklahoma Delawares, the Munsees,* from sharing in its present judgment, do you foresee any future legal implications for the federal government? (emphasis added)

Mr. Townsend. Mr. Chairman, I am an attorney at law and I don't know that this gives me any greater insight than anybody who is not an attorney, but my way of knowledge—if there has been any legal problem that could face the Bureau of Indian Affairs, it would be a puppy that they brought home and has grown into a ferocious beast by now.

I say this by reason of the fact that any problems that could be brought in the way of litigation has been fostered, promulgated, by the unilateral action of the Bureau. I can see none, but there have been these 1,552 applications filed. The Bureau beat the bushes to get them filed and, as far as whether or not any of those people would be interested in instituting litigation, I would say that based upon their track record the chances are nil.

I say that because of the fact that they did not respond to my brief in 1966. They did not respond any further than discussing the matter with their counsel subsequent to that time. No one was present at the House of Representatives Subcommittee on Indian Affairs hearing in 1968. No member of the Munsee Tribe was present at the House Subcommittee hearing last November which was passed over into this March. No members of the Munsee Tribe, nor did they have representatives at those meetings or the March meeting before the House.

Of course, anyone can go to a lawyer, draw up a paper and call it a lawsuit, but I don't think this is what your question implies. I don't foresee the possibility of a meritorious lawsuit in this matter.

Senator Bellmon. Mr. Snake.

Mr. Snake. Mr. Chairman, I am of the same opinion. Since all of these claims have been in hearing, we have never to this date had any Munsee to testify. So I am of the same opinion that there would not be any lawsuit. *Id.* at 69–71.

### C

Article IX of the 1866 Treaty (14 Stat. 793, 796) provides:

Article IX. It is also stipulated that the Secretary of the Interior shall cause a registry to be made of the names of all of said Delawares who have elected to dissolve their tribal relations and to become citizens of the United States, as provided in this treaty, with the names, ages, and sex of the members of the family of each of said Delawares, and present a certified copy of the same to the judge of the district court of the United States for the district of Kansas, and cause a copy to be filed in the office of the commissioner of Indian affairs, after which any of said Delawares, being adults, may appear before the said judge in open court, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and also make proof to the satisfaction of said court, that he is sufficiently intelligent and prudent to control his own affairs and interests, that he has adopted the habits of civilized life, and has been able to support, for at least five years, himself and family; when he shall receive a certificate of the same under the seal of the said court; and on the filing of the said certificate in the office of the commissioner of Indian affairs, the said Delaware Indian shall be constituted a citizen of the United States, and be entitled to receive a patent in fee simple, with power of alienation, for the land heretofore allotted to him, and his just proportion, in cash or in bonds, of the cash value of the credits of said tribe, principal and interest, then held in trust by the United States; and also, as the same may be received, his proportion of the proceeds of the sale of lands under the provisions of this treaty, when he shall cease to be a member of said tribe. Whereupon all of the minor children of those who have become citizens shall be construed to have elected to sever their connection with said tribe for the time being, and be entitled to their just proportion of the annuities of the tribe, to be paid to the head of the family to be expended for their support and education until they shall attain the age of twenty-one years, after which each shall elect to remove to his tribe or to become a citizen of the United States, as hereinbefore provided, and if thus admitted to citizenship, shall be entitled to all the privileges and interests herein provided for the head of the family. Should any minor as aforesaid, arriving at the age of twenty-one years, and electing to become a citizen of the United States, or any adult Indian having so elected, fail to be admitted, he shall not be compelled to remove, but the Secretary of the Interior shall provide proper guardianship for the protection of his rights and interests and those of his family. There shall be granted to each of the Delawares who have thus become citizens, a patent in fee simple for the lands heretofore allotted to them, and, if they do not remove with the nation, their pro rata share of all annuities and trust property held by the United States for them, the division to be made under the direction of the President of the United States, after which such persons shall cease to be members of the Delaware tribe, and shall not further participate in their councils, nor share in their property or annuities.

The Act of 1874 (18 Stat. 146, 175) appropriated an amount for payment of interest on the Delaware general fund, then added:

For this amount, to enable the Secretary of the Interior to pay to the children of the Delaware Indians who became citizens of the United States under the provisions of the ninth article of the Delaware treaty of July fourth, eighteen hundred and sixty-six, and the children of Betsey Zeigler, who died before completing her citizenship under the provisions of said article, their proportionate share of the money and stocks held in trust by the United States for the Delaware tribe of Indians, fifty-four thousand five hundred and fourteen dollars and twenty-three cents, of which twenty-

one thousand four hundred and forty-eight dollars and seven cents shall be deducted from the money-credits of said tribe, and thirty-three thousand and sixty-six dollars and sixteen cents, to be taken equitably from their several kinds of stock, shall be transferred to the Secretary of the Treasury and become the property of the United States: Provided, That if the Secretary of the Interior shall so determine, the whole amount hereby appropriated shall be taken from the money-credits of the tribe, the Secretary of the Interior to designate the funds from which said amounts shall be taken: Provided, That in the case of deceased persons, the Secretary of the Interior shall make payment to their legal representatives; and said Delaware children are hereby declared to be citizens of the United States, with all the rights, privileges, and immunities of such; and the Secretary of the Interior is hereby authorized and directed to cause patents to issue in fee-simple to said persons for the lands allotted to them; and in case of the decease of any of said persons, the said patents shall issue in the names of such deceased persons, including the said Betsey Zeigler, and the title to the lands designated in such patents shall inure to and become vested in the heirs, devisees, or assignees of said deceased patentees, as if the patent had issued to the deceased person during life; and the Secretary of the Interior shall cause patents to be issued in fee-simple in the names of Barbara Zeigler, Martha Zeigler, Samuel Ketchum, Nathan S. Tiblow, and Francis H. Grinter, who belonged to the families of the citizen class, and who died prior to the census of said Indians made by the agent under the provisions of the treaty of July fourth, eighteen hundred and sixty-six, for the lands allotted to them; and the lands designated in such patents shall inure to and become vested in the heirs, devisees, or assignees of said deceased patentees, as if the patent had issued to the deceased person during life.

DAUGHERTY, Chief District Judge (concurring in part and dissenting in part):

I concur in part and dissent in part. I concur in that part of the majority opinion which results in upholding the distribution of funds ordered by the Congress in 25 U.S.C. §§ 1181–6 and rejecting Plaintiffs' attacks thereon. However, I must dissent to that part of the majority opinion which declares the distribution of funds ordered by the Congress in 25 U.S.C. §§ 1291–7 to be void and unconstitutional.

## PLENARY POWER OF CONGRESS

I consider such distribution of funds to the Indian Tribes and members on their rolls as ordered by Congress in 25 U.S.C. §§ 1291–7 to be within the plenary power of Congress in relation to Indians and not justiciable. In *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) it was held:

"Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."

This case has not been reversed and the decisions following it are too numerous to cite. However, as late as 1973 our Court of Appeals in *National Indian Youth Counc., Int. Ind. Sch. Chap. v. Bruce,* 485 F.2d 97 (Tenth Cir. 1973) held:

"District courts are also without jurisdiction when confronted with non-justiciable political questions, such as determining the status of Indian tribes. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Congress has exclusive plenary legislative authority over Indians and all of their tribal relations. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). This court has recognized the plenary power of Congress to control and manage the affairs of its Indian wards. *Wolfe v. Phillips,* 172 F.2d 481 (10th Cir. 1949), cert. de-

nied 336 U.S. 968, 69 S.Ct. 941, 93 L.Ed. 1119 (1949); *Taylor v. Tayrien,* 51 F.2d 884 (10th Cir. 1931)."

Also see *Groundhog v. Keeler,* 442 F.2d 674 (Tenth Cir. 1971).

Congress did not have to create the Indian Claims Commission, 25 U.S.C. § 70 et seq., to allow Indians to present claims for redress for past Government wrongs. Nor was Congress required to appropriate and distribute funds regarding a final award recommended by the Commission. Congress by provisions in the Indian Claims Commission Act reserved unto itself the matter of determining the distribution to be made of appropriated funds in payment of awards recommended by the Commission. All of this is pursuant to the unique plenary authority of Congress over Indians. It is therefore my belief that the attacks made herein on the distributions of funds to Indians as ordered by the Acts of Congress involved herein are non-justiciable. I have not found a single case in which an Act of Congress relating to the affairs of Indians has been stricken down as being unconstitutional and void as the majority does herein.

### TREATY PROVISIONS

In addition, the Treaty itself, which is the foundation of Plaintiffs' alleged rights, gives full authority and discretion to Congress in the matter of the distribution of funds derived from the land sales when it provides in Article 8 in part as follows:

" * * * and *in distributing the funds to the (Delaware) people,* due regard and encouragement shall be given to that portion of the Delawares who are competent to manage their own affairs, * * * but *Congress may, at any time, and from time to time, by law, make such rules and regulations in relation to the funds arising from the sale of said lands, and the application thereof for the benefit and improvement of the Delaware people, as may, in the wisdom of that body,* seem just and proper." (Emphasis added)

Thus, Congress had treaty authority with the Delaware Nation (as well as plenary power) to use its wisdom in the distribution of the funds involved herein to the Delaware people.

### APPROPRIATED FUNDS

Furthermore, I am unable to discard the proposition urged by the Defendants that the Acts of Congress under attack are appropriations of public funds within the meaning of Article 1, Section 9, Clause 7, United States Constitution, and as such may not be redesignated by the Courts under the pronouncement of *United States v. Price,* 116 U.S. 43, 6 S.Ct. 235, 29 L.Ed. 541 (1885). This early case and those following it teach that no discretion is vested in the Secretary of the Treasury "or in any Court" to determine the correctness of either the amount or the designee of a payment ordered by an Act of Congress. Congress by 25 U.S.C. § 70u reserved unto itself exclusive power to distribute, or to decline to distribute, the appropriated funds necessary to pay any final award recommended by the Indian Claims Commission. The majority opinion has the effect of ordering a redesignation of the recipients of appropriated funds from those designated by the Congress.

### RATIONALITY

Also, there is the matter of whether there is rationality in the Acts passed by Congress which the majority strikes down. Ordinarily, determination and classification laws are upheld if there is a rational basis for the same. *United States v. DePugh,* 266 F.Supp. 453 (W.D. Mo.1967), aff'd, 393 F.2d 367 (Eighth Cir. 1986), cert. den., 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102.[1] At one point in

1. This case provides:

"This Court is governed by the fundamental rule of statutory construction that a presumption of validity attaches to an Act of

Congress, and that such presumption is not lightly overcome. See, *United States v. National Dairy Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) rehearing denied

this litigation I agreed (without abandoning my position regarding the plenary power of Congress, the provisions of the Treaty involved granting Congress full power regarding the distribution of funds pertaining to the sale of the Indian lands and that the funds here distributed by Congress are an appropriation of public funds) to hear evidence and arguments and receive Briefs on the rationality question. As I read the majority opinion it turns on an alleged lack of rationality or lack of a rational basis for the Congress to exclude the so-called Kansas Delawares from the distribution of funds ordered by 25 U.S.C. §§ 1291–7. I find in the record an abundance of rationality to support the distribution of funds made by Congress in these Acts and do so differently than in 25 U.S.C. §§ 1181–6.

The Indian Claims Commission is without authority to fix the distribution to be made of their recommended awards. See 25 U.S.C. § 70r as to the contents of the final determination of the Commission. "How the award is to be paid and precisely who can participate * * * are questions for Congressional and administrative determination." *Snoqualmie Tribe of Indians v. United States,* 372 F.2d 951 at page 957, 178 Ct.Cl. 570 (1967); *Peoria Tribe of Oklahoma v. United States,* 169 Ct.Cl. 1009 at page 1011–12 (1965). But the fact is that the Commission nevertheless recommended or at least suggested to whom their recommended awards in both CD 337 and CD 72 and CD 298 should be distributed. In CD 337 the Commission announced the idea of a distribution to individuals who could establish requisite Delaware blood entitlement and did so notwithstanding the obvious fact that the lands involved were tribal lands and not individual lands.[2] Congress adopted or followed this suggested distribution in its appropriation and distribution enactments and such problems, turmoil, confusion and delay ensued that these funds have not yet been fully distributed! In CD 72 and 298 the Commission recommended or suggested (and again the Congress followed the same) that the funds be distributed to the two recognized Tribes of Delaware Indians and members on their rolls which is what the Commission should have recommended or suggested and the Congress should have done in CD 337. It is believed fair to conclude that this change in attitude about distribution in both the Commission and the Congress came from the problems which resulted from the earlier distribution and the realization that it was wrong. This is a rational basis for the decision of the Congress exercised in enacting 25 U.S.C. §§ 1291–7. But there is more rationality.

The so-called Kansas Delawares on the one hand and the Cherokee (or Oklahoma) Delawares and the Absentee Delawares on the other hand over 100 years ago came to a parting of the ways. The Delaware Indian Nation ceded their lands in Kansas, moved to Oklahoma from Kansas, affiliated with the Cherokee Nation in Oklahoma and the Caddo-Wichita Indian Tribe in Oklahoma, its individuals maintained Indian citizenship, and they have maintained tribal recognition and organization for over 100 years. On forty-one (41) occasions since removal to Oklahoma Congress has recognized these Oklahoma Delaware Tribes in legislative measures. The so-called Kansas

---

372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13; *McMahon v. City of Dubuque, Iowa,* 255 F.2d 154, 160 (8th Cir. 1958) cert. den. 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70. So long as a rationally sound basis exists for the congressional determination or classification, that determination is within the constitutional power of Congress. *Egan v. United States,* 137 F.2d 369, 375 (8th Cir. 1943), cert. den. 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474; *Stutz v. Bureau of Narcotics, etc.,* 56 F.Supp. 810, 813 (N.D.Cal.1944). It is a matter of legislative judgment. See, *Kentucky Whip and Collar Co. v. Illinois Central Railroad Co.,* 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270 (1937)."

**2.** Public lands and public funds of Indian Tribes are tribal properties and are not held in individual ownership. *Minnesota-Chippewa Tribe v. United States,* 315 F.2d 906, 161 Ct.Cl. 258 (1963).

Delawares stayed in Kansas, individually took an allotment of tribal land in Kansas in fee with power of alienation, individually took their proportionate share of trust funds held by the Delaware Tribe, took United States citizenship, renounced Delaware citizenship, obtained provisions allowing their minor children to take United States citizenship (which eventually occurred) and fully divorced themselves from the Delaware Tribe which left Kansas for parts in Oklahoma. This most significant turn of events affords a rational basis for the Congress to distribute the award recommended by the Commission regarding tribal lands to these recognized Delaware Tribes and to those on the rolls of these recognized Delaware Tribes, to the exclusion of those who took land in Kansas, took their share of tribal funds and became United States citizens. In *Miami Tribe of Oklahoma v. United States*, 281 F.2d 202, 150 Ct.Cl. 725 (1960) it is held:

> "The Indian Claims Commission found that the Indiana Miami who had remained in or who returned to Indiana without tribal consent had separated themselves from the tribe, severed their tribal relationship, and lost all right to participate in the tribal assets, funds or property. This conclusion is correct. *Eastern Band of Cherokee Indians v. United States,* 117 U.S. 288, 309–312, 6 S.Ct. 718, 29 L.Ed. 880; *Prairie Band of Potawatomi Indians v. United States,* Appeal No. 2–57, decided July 16, 1958, 165 F.Supp. 139, 143 Ct.Cl. 131 (slip opinion, pp. 12 and 20)."

And it seems to me that the majority overlooks another significant distinction which is present with reference to the distribution made by Congress in 25 U.S.C. §§ 1181–6 (which the majority upholds) and the distribution made by Congress in 25 U.S.C. §§ 1291–7 (which the majority declares to be unconstitutional and void as possessing no rational basis) which provides rationality for the later distribution being different from the earlier distribution. The distribution made in 25 U.S.C. §§ 1181–6 pertained to the sale of Delaware lands in Indiana. The distribution made in 25 U.S.C. §§ 1291–7 pertained to the sale of Delaware lands in Kansas. After ceding the lands in Indiana the Delawares moved to Missouri and thence to Kansas. None stayed in Indiana, none took an allotment of land in Indiana in fee, none took their proportionate share of tribal funds and none took United States citizenship. The Delawares in Kansas maintained tribal identity. Whereas, when the Kansas lands were ceded a vastly different turn of events ensued as above pointed out and which will not be repeated. This significant difference provides rationality for the distribution made in 25 U.S.C. §§ 1291–7 as distinguished from that made in the earlier distribution.

Also there was legal precedent for the distribution made by Congress in the distribution ordered in CD 72 and 298. When an award became payable to the Delaware Tribe for a strip of land in Kansas known as the Delaware "outlet" it was paid to the Oklahoma Delawares (Delaware Tribe of Indians and Absentee Delaware Tribe of Oklahoma) to the exclusion of the so-called Kansas Delawares, the same as the distribution of Congress in 25 U.S.C. §§ 1291–7. See *United States v. Delaware Tribe of Indians,* 427 F.2d 1218 (Ct.Cl.1970).

Another legal precedent for the distinction made by the Congress is the ruling in *Minnesota-Chippewa Tribe v. United States,* 161 Ct.Cl. 258, 315 F.2d 906 (1963) which held that public lands and public funds of Indian tribes are tribal properties and are not held in individual ownership. The majority opinion acknowledges that the so-called Kansas Delawares do not have a vested interest in the fund. This is further rationale for Congress to distribute the moneys derived from the sale of tribal lands to be paid in part (10%) to the existing and recognized Tribes and the balance to those members on the rolls of existing and recognized Tribes to the exclusion of those not members of the Tribes nor on their rolls and who over 100 years ago had taken individual allotments of tribal land in Kansas in fee simple, had taken

their individual proportionate part of the existing tribal funds, left the Tribe, renounced Tribal membership and took United States citizenship.

How much rationale must Congress have in exercising its plenary legislative authority regarding Indian affairs? Assuming that some rationale must be present, which is doubted as to the exercise of the unique plenary power of Congress in Indian matters, there is in any event an abundance shown by the record. Congress had before it another Bill which would have distributed CD 72 and 298 funds in exactly the same manner as the wrongful and horrendous distribution made in CD 337. Congress rejected this Bill with full knowledge that there were some people claiming Delaware ancestry and entitlement to Delaware Tribal funds who would not be included within this distribution to the two recognized Delaware Tribes in Oklahoma and those on their membership rolls. Congress distributed appropriated funds by 25 U.S.C. §§ 1291–7 with full knowledge that it was a different distribution from that made by 25 U.S.C. §§ 1181–6. This was not a Congressional mistake. It was deliberate Congressional action and in the face thereof the majority would strike down 25 U.S.C. §§ 1291–7 and advise Congress that it erred and must legislate again and in doing so must include the so-called Kansas Delawares but need not include the Munsee Delawares or the Christian Delawares or any other Delawares not belonging to the recognized Oklahoma Tribes. What will be the result if Congress declines to permit the Court to legislate for it regarding its plenary power in Indian affairs? It could be that Congress will decline to change its position for it acted rightly and within its authority or perhaps Congress will balk and refuse to distribute anything to anyone which is also within its power under the Indian Claims Commission Act. It is my belief and position that if in fact Congress has made a plain and grievous error regarding the so-called Kansas Delawares in the passage of 25 U.S.C. §§ 1291–7 (which I do not believe to be the case)

upon petition and showing to the Congress by those aggrieved the Congress may correct the error and by virtue of its plenary power over Indian affairs the Congress is the only agency of the Government with power and authority to entertain Plaintiffs' complaint.